# EXECUTIVE JET AVIATION, INC., ET AL. *v.* CITY OF CLEVELAND ET AL.

No. 71–678.   Argued November 15, 1972—
Decided December 18, 1972

STEWART, J., delivered the opinion for a unanimous Court.

*Phillip D. Bostwick* argued the cause and filed briefs for petitioners.

*Solicitor General Griswold* argued the cause for respondent Dicken.   With him on the brief were *Assistant Attorney General Wood, Allan A. Tuttle,* and *Walter H. Fleischer.   Edward D. Crocker* filed a brief for respondents City of Cleveland et al.

MR. JUSTICE STEWART delivered the opinion of the Court.

On July 28, 1968, a jet aircraft, owned and operated by the petitioners, struck a flock of seagulls as it was taking off from Burke Lakefront Airport in Cleveland, Ohio, adjacent to Lake Erie. As a result, the plane lost its power, crashed, and ultimately sank in the navigable waters of Lake Erie, a short distance from the airport. The question before us is whether the petitioners' suit for property damage to the aircraft, allegedly caused by the respondents' negligence, lies within federal admiralty jurisdiction.

When the crash occurred, the plane was manned by a pilot, a co-pilot, and a stewardess, and was departing Cleveland on a charter flight to Portland, Maine, where it was to pick up passengers and then continue to White Plains, New York. After being cleared for takeoff by the respondent Dicken, who was the federal air traffic controller at the airport, the plane took off, becoming airborne at about half the distance down the runway. The takeoff flushed the seagulls on the runway, and they rose into the airspace directly ahead of the ascending plane. Ingestion of the birds into the plane's jet engines caused an almost total loss of power. Descending back toward the runway in a semi-stalled condition, the plane veered slightly to the left, struck a portion of the airport perimeter fence and the top of a nearby pickup truck, and then settled in Lake Erie just off the end of the runway and less than one-fifth of a statute mile offshore. There were no injuries to the crew, but the aircraft soon sank and became a total loss.

Invoking federal admiralty jurisdiction under 28

U. S. C. § 1333 (1),[1] the petitioners brought this suit for damages in the District Court for the Northern District of Ohio against Dicken and the other respondents,[2] alleging that the crash had been caused by the respondents' negligent failure to keep the runway free of the birds or to give adequate warning of their presence.[3] The District Court, in an unreported opinion, held that the suit was not cognizable in admiralty and dismissed the complaint for lack of subject matter jurisdiction.

Relying primarily on the Sixth Circuit precedent of *Chapman* v. *City of Grosse Pointe Farms*, 385 F. 2d 962 (1967), the District Court held that admiralty jurisdiction over torts may properly be invoked only when two criteria are met: (1) the locality where the alleged tortious wrong occurred must have been on navigable waters; and (2) there must have been a relationship between the wrong and some maritime service, navigation, or commerce on navigable waters. The District Court found that the allegations of the petitioners' complaint satisfied neither of these criteria. With respect to the locality of the alleged wrong, the court stated that "the alleged negligence became operative upon the aircraft while it was over the land; and in this sense

---

[1] That section provides:

"The district courts shall have original jurisdiction, exclusive of the courts of the States, of:

"(1) Any civil case of admiralty or maritime jurisdiction, saving to suitors in all cases all other remedies to which they are otherwise entitled."

[2] Besides Dicken, the respondents are the City of Cleveland, as owner and operator of the airport, and Phillip A. Schwenz, the airport manager.

[3] The petitioners also filed an action against Dicken's employer, the United States, under the Federal Tort Claims Act, 28 U. S. C. §§ 1346 (b) and 2674, asserting the same claim. That action is pending in the District Court for the Northern District of Ohio.

the 'impact' of the alleged negligence occurred when the gulls disabled the plane's engines [over the land] . . . . From this point on the plane was disabled and was caused to fall. Whether it came down upon land or upon water was largely fortuitous." Alternatively, the court concluded that the wrong bore no relationship to maritime service, navigation, or commerce:

"Assuming . . . that air commerce bears some relationship to maritime commerce when the former is carried out over navigable waters, the relevant circumstances here were unconnected with the maritime facets of air commerce. The claimed 'wrong' in this case was the alleged failure to keep the runway free of birds and the failure to adequately warn the pilots of their presence upon the end of the runway. When the alleged negligence occurred, and when it became operative upon the aircraft, all the parties were engaged in functions common to all air commerce, whether over land or over sea.

". . . Thus, the conclusion here must be that the operative facts of the claim in this case are concerned with the land-connected aspects of air commerce, namely, the maintenance and operation of an airport located on the land and the dangers encountered by an aircraft when using its runways for take-off."

The Court of Appeals for the Sixth Circuit affirmed on the ground that "the alleged tort in this case occurred on land before the aircraft reached Lake Erie . . . ." 448 F. 2d 151, 154 (1971). Hence, that court found it "not necessary to consider the question of maritime relationship or nexus discussed by this court in [Chapman]." Ibid. We granted certiorari to consider a seemingly important question affecting the jurisdiction of the federal courts. 405 U. S. 915 (1972).

I

Determination of the question whether a tort is "maritime" and thus within the admiralty jurisdiction of the federal courts has traditionally depended upon the locality of the wrong. If the wrong occurred on navigable waters, the action is within admiralty jurisdiction; if the wrong occurred on land, it is not. As early as 1813, Mr. Justice Story, on Circuit, stated this general principle:

> "In regard to torts I have always understood, that the jurisdiction of the admiralty is exclusively dependent upon the locality of the act. The admiralty has not, and never (I believe) deliberately claimed to have any jurisdiction over torts, except such as are maritime torts, that is, such as are committed on the high seas, or on waters within the ebb and flow of the tide." *Thomas* v. *Lane*, 23 F. Cas. 957, 960 (No. 13,902) (CC Me.).

See also *De Lovio* v. *Boit*, 7 F. Cas. 418, 444 (No. 3,776) (CC Mass. 1815); *Philadelphia, W. & B. R. Co.* v. *Philadelphia & Havre de Grace Steam Towboat Co.*, 23 How. 209, 215 (1860). Later, this locality test was expanded to include not only tidewaters, but all navigable waters, including lakes and rivers. *The Genesee Chief* v. *Fitzhugh*, 12 How. 443 (1852).

In *The Plymouth*, 3 Wall. 20, 35, 36 (1866), the Court essayed a definition of when a tort is "located" on navigable waters:

> "[T]he wrong and injury complained of must have been committed wholly upon the high seas or navigable waters, or, at least, the substance and consummation of the same must have taken place upon these waters to be within the admiralty jurisdiction. . . .

.    .    .    .    .

". . . The jurisdiction of the admiralty over maritime torts does not depend upon the wrong having been committed on board the vessel, but upon its having been committed upon the high seas or other navigable waters.

". . . Every species of tort, however occurring, and whether on board a vessel or not, if upon the high seas or navigable waters, is of admiralty cognizance."

The Court has often reiterated this rule of locality.[4] As recently as last Term, in *Victory Carriers, Inc.* v. *Law,* 404 U. S. 202, 205, we repeated that "[t]he historic view of this Court has been that the maritime tort jurisdiction of the federal courts is determined by the locality of the accident and that maritime law governs only those torts occurring on the navigable waters of the United States."

This locality test, of course, was established and grew up in an era when it was difficult to conceive of a tortious occurrence on navigable waters other than in connection with a waterborne vessel. Indeed, for the traditional types of maritime torts, the traditional test has worked quite satisfactorily. As a leading admiralty text has put the matter:

"It should be stressed that the important cases in admiralty are *not* the borderline cases on jurisdiction; these may exercise a perverse fascination in the occasion they afford for elaborate casuistry, but the main business of the [admiralty] court involves claims for cargo damage, collision, seamen's injuries and the like—all well and comfortably within the circle, and far from the penumbra." G. Gilmore & C. Black, The Law of Admiralty 24 n. 88 (1957).

[4] In *Victory Carriers, Inc.* v. *Law,* 404 U. S. 202, 205 n. 2 (1971), we cited over 40 cases to this effect.

But it is the perverse and casuistic borderline situations that have demonstrated some of the problems with the locality test of maritime tort jurisdiction. In *Smith & Son* v. *Taylor*, 276 U. S. 179 (1928), for instance, a longshoreman unloading a vessel was standing on the pier when he was struck by a cargo-laden sling from the ship and knocked into the water where he was later found dead. This Court held that there was no admiralty jurisdiction in that case, despite the fact that the longshoreman was knocked into the water, because the blow by the sling was what gave rise to the cause of action, and it took effect on the land. Hence, the Court concluded, "[t]he substance and consummation of the occurrence which gave rise to the cause of action took place on land." 276 U. S., at 182. In the converse factual setting, however, where a longshoreman working on the deck of a vessel was struck by a hoist and knocked onto the pier, the Court upheld admiralty jurisdiction because the cause of action arose on the vessel. *Minnie* v. *Port Huron Terminal Co.*, 295 U. S. 647 (1935). See also *The Admiral Peoples*, 295 U. S. 649 (1935).

Other serious difficulties with the locality test are illustrated by cases where the maritime locality of the tort is clear, but where the invocation of admiralty jurisdiction seems almost absurd. If a swimmer at a public beach is injured by another swimmer or by a submerged object on the bottom, or if a piece of machinery sustains water damage from being dropped into a harbor by a land-based crane, a literal application of the locality test invokes not only the jurisdiction of the federal courts, but the full panoply of the substantive admiralty law as well. In cases such as these, some courts have adhered to a mechanical application of the strict locality rule and have sustained admiralty jurisdiction despite the lack of any connection between the wrong and tradi-

tional forms of maritime commerce and navigation.[5] Other courts, however, have held in such situations that a maritime locality is not sufficient to bring the tort within federal admiralty jurisdiction, but that there must also be a maritime nexus—some relationship between the tort and traditional maritime activities, involving navigation or commerce on navigable waters. The Court of Appeals for the Sixth Circuit, for instance, in the *Chapman* case, where a swimmer at a public beach was injured, held that

> "[a]bsent such a relationship, admiralty jurisdiction would depend entirely upon the fact that a tort occurred on navigable waters; a fact which in and of itself, in light of the historical justification for federal admiralty jurisdiction, is quite immaterial to any meaningful invocation of the jurisdiction of admiralty courts." 385 F. 2d, at 966.[6]

---

[5] *Davis* v. *City of Jacksonville Beach,* 251 F. Supp. 327 (MD Fla. 1965) (injury to a swimmer by a surfboard); *King* v. *Testerman,* 214 F. Supp. 335, 336 (ED Tenn. 1963) (injuries to a water skier). See also *Horton* v. *J. & J. Aircraft, Inc.,* 257 F. Supp. 120, 121 (SD Fla. 1966). Cf. *Weinstein* v. *Eastern Airlines, Inc.,* 316 F. 2d 758 (CA3 1963).

[6] In another injured-swimmer case, *McGuire* v. *City of New York,* 192 F. Supp. 866, 871–872 (SDNY 1961), the court stated:

"The proper scope of jurisdiction should include all matters relating to the business of the sea and the business conducted on navigable waters.

"The libel in this case does not relate to any tort which grows out of navigation. It alleges an ordinary tort, no different in substance because the injury occurred in shallow waters along the shore than if the injury had occurred on the sandy beach above the water line. Whether the City of New York should be held liable for the injury suffered by libellant is a question which can easily be determined in the courts of the locality. To endeavor to project such an action into the federal courts on the ground of admiralty jurisdiction is to misinterpret the nature of admiralty jurisdiction."

Other cases holding that admiralty jurisdiction was not properly invoked because the tort, while having a maritime locality, lacked a

As early as 1850, admiralty scholars began to suggest that a traditional maritime activity, as well as a maritime locality, is necessary to invoke admiralty jurisdiction over torts. In that year, Judge Benedict expressed his "celebrated doubt"[7] as to whether such jurisdiction did not depend, in addition to a maritime locality, upon some "relation of the parties to a ship or vessel, embracing only those tortious violation[s] of maritime right and duty which occur in vessels to which the Admiralty jurisdiction, in cases of contracts, applies." E. Benedict, The American Admiralty 173 (1850). More recently, commentators have actively criticized the rule of locality as the sole criterion for admiralty jurisdiction, and have recommended adoption of a maritime relationship requirement as well. See 7A J. Moore, Federal Practice, Admiralty ¶¶ .325[3] and .325 [5] (2d ed. 1972); Black, Admiralty Jurisdiction: Critique and Suggestions, 50 Col. L. Rev. 259, 264 (1950). In 1969, the American Law Institute's Study of the Division of Jurisdiction Between State and Federal Courts (ALI Study) also made that recommendation, stating (at 233):

> "It is hard to think of any reason why access to federal court should be allowed without regard to amount in controversy or citizenship of the parties merely because of the fortuity that a tort

---

significant relationship to maritime navigation and commerce, include: *Peytavin* v. *Government Employees Insurance Co.*, 453 F. 2d 1121 (CA5 1972); *Gowdy* v. *United States*, 412 F. 2d 525, 527–529 (CA6 1969); *Smith* v. *Guerrant*, 290 F. Supp. 111, 113–114 (SD Tex. 1968). See also *J. W. Petersen Coal & Oil Co.* v. *United States*, 323 F. Supp. 1198, 1201 (ND Ill. 1970); *O'Connor & Co.* v. *City of Pascagoula*, 304 F. Supp. 681, 683 (SD Miss. 1969); *Hastings* v. *Mann*, 226 F. Supp. 962, 964–965 (EDNC 1964), aff'd, 340 F. 2d 910 (CA4 1965). A similar view is taken by the English courts. *Queen* v. *Judge of the City of London Court,* [1892] 1 Q. B. 273.

[7] Hough, Admiralty Jurisdiction—Of Late Years, 37 Harv. L. Rev. 529, 531 (1924).

occurred on navigable waters, rather than on other waters or on land. The federal courts should not be burdened with every case of an injured swimmer."

Despite the broad language of cases like *The Plymouth*, 3 Wall. 20 (1866), the fact is that this Court has never explicitly held that a maritime locality is the sole test of admiralty tort jurisdiction. The last time the Court considered the matter, the question was left open. *Atlantic Transport Co.* v. *Imbrovek*, 234 U. S. 52 (1914). In that case, a stevedore brought suit for injuries sustained on board a vessel while loading and stowing copper. The petitioner admitted the maritime locality of the tort, but contended that no maritime relationship was present. The Court sustained federal admiralty jurisdiction, but found that it was not necessary to decide whether locality alone is sufficient:

> "Even if it be assumed that the requirement as to locality in tort cases, while indispensable, is not necessarily exclusive, still in the present case the wrong which was the subject of the suit was, we think, of a maritime nature and hence the District Court, from any point of view, had jurisdiction. . . .
>
> ". . . If more is required than the locality of the wrong in order to give the court jurisdiction, the relation of the wrong to maritime service, to navigation and to commerce on navigable waters, was quite sufficient." *Id.*, at 61, 62.

Since the time of that decision the Court has not squarely dealt with the question left open there, although opinions in several cases have discussed the maritime or non-maritime nature of the tort and its relationship to maritime navigation. In *Rodrigue* v. *Aetna Casualty & Surety Co.*, 395 U. S. 352 (1969), for instance, we held that admiralty had no jurisdiction of wrongful-death actions under the Death on the High Seas Act, 41 Stat.

537, 46 U. S. C. § 761 *et seq.,* arising out of accidents on artificial island drilling rigs in the Gulf of Mexico more than a marine league offshore. We relied in that case on the fact that the accidents bore no relation to any navigational function:

> "The accidents in question here involved no collision with a vessel, and the structures were not navigational aids. They were islands, albeit artificial ones, and the accidents had no more connection with the ordinary stuff of admiralty than do accidents on piers." *Id.,* at 360.

See also *The Raithmoor,* 241 U. S. 166, 176–177 (1916); *Chelentis* v. *Luckenbach S. S. Co.,* 247 U. S. 372, 382 (1918); *Great Lakes Dredge & Dock Co.* v. *Kierejewski,* 261 U. S. 479, 481 (1923); *Robins Dry Dock & Repair Co.* v. *Dahl,* 266 U. S. 449, 457 (1925); *London Guarantee & Accident Co.* v. *Industrial Accident Comm'n,* 279 U. S. 109, 123 (1929).

Apart from the difficulties involved in trying to apply the locality rule as the sole test of admiralty tort jurisdiction, another indictment of that test is to be found in the number of times the federal courts and the Congress, in the interests of justice, have had to create exceptions to it in the converse situation—*i. e.,* when the tort has no maritime locality, but does bear a relationship to maritime service, commerce, or navigation. See 7A J. Moore, Federal Practice, Admiralty ¶ .325 [4] (2d ed. 1972). For example, in *O'Donnell* v. *Great Lakes Dredge & Dock Co.,* 318 U. S. 36 (1943), the Court sustained the application of the Jones Act, 41 Stat. 1007, 46 U. S. C. § 688, to injuries to a seaman on land, because of the seaman's connection with maritime commerce. We relied in that case on an analogy to maintenance and cure:

> "[T]he maritime law, as recognized in the federal courts, has not in general allowed recovery for per-

sonal injuries occurring on land. But there is an important exception to this generalization in the case of maintenance and cure. From its dawn, the maritime law has recognized the seaman's right to maintenance and cure for injuries suffered in the course of his service to his vessel, whether occurring on sea or on land." *Id.,* at 41–42.

Similarly, the doctrine of unseaworthiness has been extended to permit a seaman or a longshoreman to recover from a shipowner for injuries sustained wholly on land, so long as those injuries were caused by defects in the ship or its gear. *Gutierrez* v. *Waterman S. S. Corp.,* 373 U. S. 206, 214–215 (1963). See also *Strika* v. *Netherlands Ministry of Traffic,* 185 F. 2d 555 (CA2 1950).

Congress, too, has extended admiralty jurisdiction predicated on the relation of the wrong to maritime activities, regardless of the locality of the tort. In the Extension of Admiralty Jurisdiction Act, 62 Stat. 496, 46 U. S. C. § 740, enacted in 1948, Congress provided:

"The admiralty and maritime jurisdiction of the United States shall extend to and include all cases of damage or injury, to person or property, caused by a vessel on navigable water, notwithstanding that such damage or injury be done or consummated on land."

This Act was passed specifically to overrule cases, such as *The Plymouth, supra,* holding that admiralty does not provide a remedy for damage done to land structures by ships on navigable waters. *Victory Carriers, Inc.* v. *Law,* 404 U. S., at 209 n. 8; *Gutierrez* v. *Waterman S. S. Corp.,* 373 U. S., at 209–210.[8]

---

[8] The Court has held, however, that there is no admiralty jurisdiction under the Extension of Admiralty Jurisdiction Act over suits brought by longshoremen injured while working on a pier, when such

In sum, there has existed over the years a judicial, legislative, and scholarly recognition that, in determining whether there is admiralty jurisdiction over a particular tort or class of torts, reliance on the relationship of the wrong to traditional maritime activity is often more sensible and more consonant with the purposes of maritime law than is a purely mechanical application of the locality test.

## II

One area in which locality as the exclusive test of admiralty tort jurisdiction has given rise to serious problems in application is that of aviation. For the reasons discussed above and those to be discussed, we have concluded that maritime locality alone is not a sufficient predicate for admiralty jurisdiction in aviation tort cases.

In one of the earliest aircraft cases brought in admiralty, *The Crawford Bros. No. 2*, 215 F. 269, 271 (WD Wash. 1914), in which a libel *in rem* for repairs was brought against an airplane that had crashed into Puget Sound, the federal court declined to assume jurisdiction, reasoning that an airplane could not be characterized as a maritime vessel. *The Crawford Bros.* was followed by a number of cases dealing with seaplanes, in which the courts restricted admiralty jurisdiction to occurrences involving planes that were afloat on navigable waters.[9] Continuing doubt as to the applicability

---

injuries were caused, not by ships, but by pier-based equipment. *Victory Carriers, Inc.* v. *Law, supra; Nacirema Co.* v. *Johnson*, 396 U. S. 212, 223 (1969). The Longshoremen's and Harbor Workers' Compensation Act, 33 U. S. C. § 901 *et seq.*, was amended in 1972 to cover employees working on those areas of the shore customarily used in loading, unloading, repairing, or building a vessel. Pub. L. No. 92–576, § 2, 86 Stat. 1251.

[9] *Matter of Reinhardt* v. *Newport Flying Service Corp.*, 232 N. Y. 115, 117–118, 133 N. E. 371, 372 (1921); *United States* v. *Northwest Air Service, Inc.*, 80 F. 2d 804, 805 (CA9 1935). See also *Lambros Seaplane Base* v. *The Batory*, 215 F. 2d 228, 231 (CA2 1954).

of admiralty law to aircraft was illustrated by cases in the 1930's and 1940's holding that aircraft owners could not invoke the benefits of the maritime doctrine of limitation of liability,[10] and that crimes committed on board aircraft flying over international waters were not punishable under criminal statutes proscribing acts committed on the high seas.[11] Moreover, Congress exempted all aircraft from conformity with United States navigation and shipping laws.[12]

The first major extension of admiralty jurisdiction to land-based aircraft came in wrongful-death actions arising out of aircraft crashes at sea and brought under the Death on the High Seas Act, 46 U. S. C. § 761 *et seq.* The federal courts took jurisdiction of such cases because the literal provisions of that statute appeared to be clearly applicable. The Death on the High Seas Act, enacted in 1920, provides:

> "Whenever the death of a person shall be caused by wrongful act, neglect, or default occurring on the high seas beyond a marine league from the shore of any State, or the District of Columbia, or the Territories or dependencies of the United States, the personal representative of the decedent may

---

[10] *Dollins* v. *Pan-American Grace Airways, Inc.*, 27 F. Supp. 487, 488–489 (SDNY 1939); *Noakes* v. *Imperial Airways, Ltd.*, 29 F. Supp. 412, 413 (SDNY 1939).

[11] *United States* v. *Peoples*, 50 F. Supp. 462 (ND Cal. 1943); *United States* v. *Cordova*, 89 F. Supp. 298 (EDNY 1950).

In 1952, however, Congress amended the criminal jurisdiction of admiralty to include crimes committed aboard aircraft while in flight over the high seas or any other waters within the admiralty jurisdiction of the United States except waters within the territorial jurisdiction of any State. 18 U. S. C. § 7 (5).

[12] The Federal Aviation Act of 1958, 72 Stat. 799, as amended, 49 U. S. C. § 1509 (a), the successor to the Air Commerce Act of 1926, 44 Stat. 572, formerly 49 U. S. C. § 177 (1952 ed.).

maintain a suit for damages in the district courts of the United States, in admiralty . . . ."

The first aviation case brought pursuant to the Death on the High Seas Act was apparently *Choy* v. *Pan-American Airways Co.*, 1941 A. M. C. 483 (SDNY), where death was caused by the crash of a seaplane into the Pacific Ocean during a transoceanic flight. The District Court upheld admiralty jurisdiction on the ground that the language of the Act was broad and made no reference to surface vessels. According to the court:

> "The statute certainly includes the phrase 'on the high seas' but there is no reason why this should make the law operable only on a horizontal plane. The very next phrase 'beyond a marine league from the shore of any State' may be said to include a vertical sense and another dimension." *Id.*, at 484.

Since *Choy*, many actions for wrongful death arising out of aircraft crashes into the high seas beyond one marine league from shore have been brought under the Death on the High Seas Act, and federal jurisdiction has consistently been sustained in those cases.[13] Indeed, it may be

---

[13] See, *e. g.*, *Wyman* v. *Pan-American Airways, Inc.*, 181 Misc. 963, 966, 43 N. Y. S. 2d 420, 423, aff'd, 267 App. Div. 947, 48 N. Y. S. 2d 459, aff'd, 293 N. Y. 878, 59 N. E. 2d 785 (1944); *Higa* v. *Transocean Airlines*, 230 F. 2d 780 (CA9 1955); *Noel* v. *Linea Aeropostal Venezolana*, 247 F. 2d 677, 680 (CA2 1957); *Trihey* v. *Transocean Air Lines*, 255 F. 2d 824, 827 (CA9 1958); *Lacey* v. *L. W. Wiggins Airways, Inc.*, 95 F. Supp. 916 (Mass. 1951); *Wilson* v. *Transocean Airlines*, 121 F. Supp. 85 (ND Cal. 1954); *Stiles* v. *National Airlines, Inc.*, 161 F. Supp. 125 (ED La. 1958), aff'd, 268 F. 2d 400 (CA5 1959); *Noel* v. *Airponents, Inc.*, 169 F. Supp. 348 (NJ 1958); *Lavello* v. *Danko*, 175 F. Supp. 92 (SDNY 1959); *Blumenthal* v. *United States*, 189 F. Supp. 439, 445 (ED Pa. 1960), aff'd, 306 F. 2d 16 (CA3 1962); *Pardonnet* v. *Flying Tiger Line, Inc.*, 233 F. Supp. 683 (ND Ill. 1964); *Kropp* v. *Douglas Aircraft Co.*, 329 F. Supp. 447, 453–455 (EDNY 1971). Cf. *D'Aleman* v. *Pan American World Airways*, 259 F. 2d 493 (CA2 1958).

considered as settled today that this specific federal statute gives the federal admiralty courts jurisdiction of such wrongful-death actions.

In recent years, however, some federal courts have been persuaded in aviation cases to extend their admiralty jurisdiction beyond the statutory coverage of the Death on the High Seas Act. Several cases have held that actions for *personal injuries* arising out of aircraft crashes into the high seas more than one league off shore or arising out of aircraft accidents in the airspace over the high seas were cognizable in admiralty because of their maritime locality, although they were not within the scope of the Death on the High Seas Act or any other federal legislation.[14] These cases, as well as most of those brought under the Death on the High Seas Act, involved torts both with a maritime locality, in that the alleged negligence became operative while the aircraft was on or over navigable waters, and also with some relationship to maritime commerce, at least insofar as the aircraft was beyond state territorial waters and performing a function—transoceanic crossing—that previously would have been performed by waterborne vessels.[15]

But a further extension of admiralty jurisdiction was created when courts began to sustain that jurisdiction in situations such as the one now before us—when the claim arose out of an aircraft accident that occurred on or over navigable waters *within* state territorial limits,

---

[14] *Bergeron* v. *Aero Associates, Inc.*, 213 F. Supp. 936 (ED La. 1963); *Notarian* v. *Trans World Airlines, Inc.*, 244 F. Supp. 874 (WD Pa. 1965); *Horton* v. *J. & J. Aircraft, Inc.*, 257 F. Supp. 120 (SD Fla. 1966).

[15] Whether this type of relationship to maritime commerce is a sufficient maritime nexus to justify admiralty jurisdiction over airplane accidents is discussed *infra*, at 271–272. We do not decide that question in this case.

and when the aircraft was not on a transoceanic flight. Apparently, the first such case grew out of a 1960 crash of a commercial jet, bound from Boston to Philadelphia, that collided with a flock of birds over the airport runway and crashed into Boston Harbor within one minute after takeoff. *Weinstein* v. *Eastern Airlines, Inc.*, 316 F. 2d 758 (CA3 1963). In deciding that a wrongful-death action arising from this crash was within admiralty jurisdiction, the Court of Appeals for the Third Circuit applied the strict locality rule and found that the tort had a maritime locality. The court further justified the invocation of admiralty jurisdiction in that case by an analogy to the Death on the High Seas Act:

> "If, as it has been held, a tort claim arising out of the crash of an airplane beyond the one marine league line is within the jurisdiction of admiralty, then *a fortiori* a crash of an aircraft just short of that line but still within the navigable waters is within that jurisdiction as well." *Id.*, at 765.

There have been a few subsequent cases to like effect.[16] To the contrary, of course, is the decision of the Court of Appeals for the Sixth Circuit in the present case.

### III

These latter cases graphically demonstrate the problems involved in applying a locality-alone test of admiralty tort jurisdiction to the crashes of aircraft. Airplanes, unlike waterborne vessels, are not limited by physical boundaries and can and do operate over both land and navigable bodies of water. As Professor Moore and

---

[16] *Hornsby* v. *Fish Meal Co.*, 431 F. 2d 865 (CA5 1970); *Harris* v. *United Air Lines, Inc.*, 275 F. Supp. 431, 432 (SD Iowa 1967). Cf. *Scott* v. *Eastern Air Lines, Inc.*, 399 F. 2d 14, 21–22 (CA3 1968) (*en banc*).

his colleague Professor Pelaez have stated, "In both death and injury cases . . . it is evident that while distinctions based on locality often are in fact quite relevant where water vessels are concerned, they entirely lose their significance where aircraft, which are not geographically restrained, are concerned." 7A J. Moore, Federal Practice, Admiralty ¶ .330 [5], pp. 3772–3773 (2d ed. 1972). In flights within the continental United States, which are principally over land, the fact that an aircraft happens to fall in navigable waters, rather than on land, is wholly fortuitous. The ALI Study, in criticizing the *Weinstein* decision, observed:

> "If a plane takes off from Boston's Logan Airport bound for Philadelphia, and crashes on takeoff, it makes little sense that the next of kin of the passengers killed should be left to their usual remedies, ordinarily in state court, if the plane crashes on land, but that they have access to a federal court, and the distinctive substantive law of admiralty applies, if the wrecked plane ends up in the waters of Boston Harbor." ALI Study 231.[17]

Moreover, not only is the locality test in such cases wholly adventitious, but it is sometimes almost impossible to apply with any degree of certainty. Under the locality test, the tort "occurs" where the alleged negligence took effect, *The Plymouth, supra; Smith & Son* v. *Taylor,* 276 U. S. 179 (1928); and in the case of aircraft that locus is often most difficult to determine.

The case before us provides a good example of these difficulties. The petitioners contend that since their aircraft crashed into the navigable waters of Lake Erie and was totally destroyed when it sank in those waters, the locality of the tort, or the place where the alleged

---

[17] See also Comment, Admiralty Jurisdiction: Airplanes and Wrongful Death in Territorial Waters, 64 Col. L. Rev. 1084, 1091–1092 (1964).

negligence took effect, was there. The fact that the major damage to their plane would not have occurred if it had not landed in the lake indicates, they say, that the substance and consummation of the wrong took place in navigable waters. The respondents, on the other hand, argue that the alleged negligence took effect when the plane collided with the birds—over land. Relying on cases such as *Smith & Son* v. *Taylor, supra,* where admiralty jurisdiction was denied in the case of a longshoreman struck by a ship's sling while standing on a pier, and knocked into the water, the respondents contend that a tort "occurs" at the point of first impact of the alleged negligence. Here, they say, the cause of action arose as soon as the plane struck the birds; from then on, the plane was destined to fall, and whether it came down on land or water should not affect "the locality of the act." See *Thomas* v. *Lane,* 23 F. Cas., at 960.

In the view we take of the question before us, we need not decide who has the better of this dispute. It is enough to note that either position gives rise to the problems inherent in applying the strict locality test of admiralty tort jurisdiction in aviation accident cases. The petitioners' argument, if accepted, would make jurisdiction depend on where the plane ended up— a circumstance that could be wholly fortuitous and completely unrelated to the tort itself. The anomaly is well illustrated by the hypothetical case of two aircraft colliding at a high altitude, with one crashing on land and the other in a navigable river. If, on the other hand, the respondents' position were adopted, jurisdiction would depend on whether the plane happened to be flying over land or water when the original impact of the alleged negligence occurred. This circumstance, too, could be totally fortuitous. If the plane in the present case struck the birds over Cleveland's Lakefront Air-

port, admiralty jurisdiction would not lie; but if the plane had just crossed the shoreline when it struck the birds, admiralty jurisdiction would attach, even if the plane were then able to make it back to the airport and crashland there. These are hardly the types of distinctions with which admiralty law was designed to deal.

All these and other difficulties that can arise in attempting to apply the locality test of admiralty jurisdiction to aeronautical torts are, of course, attributable to the inherent nature of aircraft. Unlike waterborne vessels, they are not restrained by one-dimensional geographic and physical boundaries. For this elementary reason, we conclude that the mere fact that the alleged wrong "occurs" or "is located" on or over navigable waters—whatever that means in an aviation context—is not of itself sufficient to turn an airplane negligence case into a "maritime tort." It is far more consistent with the history and purpose of admiralty to require also that the wrong bear a significant relationship to traditional maritime activity. We hold that unless such a relationship exists, claims arising from airplane accidents are not cognizable in admiralty in the absence of legislation to the contrary.

## IV

This conclusion, however, does not end our inquiry, for there remains the question of what constitutes, in the context of aviation, a significant relationship to traditional maritime activity. The petitioners argue that any aircraft falling into navigable waters has a sufficient relationship to maritime activity to satisfy the test. The relevant analogy, they say, is not between flying aircraft and sailing ships, but between a downed plane and a sinking ship. Quoting from the *Weinstein* opinion, they contend: "When an aircraft crashes into navigable waters, the dangers to persons and property

are much the same as those arising out of the sinking of a ship or a collision between two vessels." 316 F. 2d, at 763. The dissenting opinion in the Court of Appeals in the present case made the same argument:

"I believe that there are many comparisons between the problems of aircraft over navigable waters and those of the ships which the aircraft are rapidly replacing. . . .

". . . Problems posed for aircraft landing on, crashing on, or sinking into navigable waters differ markedly from landings upon land. . . . In such instances, wind and wave and water, the normal problems of the mariner, become the approach or survival problems of the pilot and his passengers. . . . What I would hold is that tort cases arising out of aircraft crashes into navigable waters are cognizable in admiralty jurisdiction even if the negligent conduct is alleged to have happened wholly on land." 448 F. 2d, at 163.

We cannot accept that definition of traditional maritime activity. It is true that in a literal sense there may be some similarities between the problems posed for a plane downed on water and those faced by a sinking ship. But the differences between the two modes of transportation are far greater, in terms of their basic qualities and traditions, and consequently in terms of the conceptual expertise of the law to be applied.[18] The law of admiralty has evolved over many centuries, designed and molded to handle problems of vessels relegated to ply the waterways of the world, beyond whose

---

[18] Moreover, if the mere happenstance that an aircraft falls into navigable waters creates a maritime relationship because of the maritime dangers to a sinking plane, then the maritime relationship test would be the same as the petitioners' view of the maritime-locality test, with the same inherent fortuity.

shores they cannot go. That law deals with navigational rules—rules that govern the manner and direction those vessels may rightly move upon the waters. When a collision occurs or a ship founders at sea, the law of admiralty looks to those rules to determine fault, liability, and all other questions that may arise from such a catastrophe. Through long experience, the law of the sea knows how to determine whether a particular ship is seaworthy, and it knows the nature of maintenance and cure. It is concerned with maritime liens, the general average, captures and prizes, limitation of liability, cargo damage, and claims for salvage.

Rules and concepts such as these are wholly alien to air commerce, whose vehicles operate in a totally different element, unhindered by geographical boundaries and exempt from the navigational rules of the maritime road. The matters with which admiralty is basically concerned have no conceivable bearing on the operation of aircraft, whether over land or water. Indeed, in contexts other than tort, Congress and the courts have recognized that, because of these differences, aircraft are not subject to maritime law.[19] Although dangers of wind and wave faced by a plane that has crashed on navigable waters may be superficially similar to those encountered by a sinking ship, the plane's unexpected descent will almost invariably have been attributable to a cause unrelated to the sea—be it pilot error, defective design or manufacture of airframe or engine, error of a traffic controller at an airport, or some other cause; and the determination of liability will thus be based on factual and conceptual inquiries unfamiliar to the law of admiralty. It is clear, therefore, that neither the fact that a plane goes down on navigable waters nor the fact that the negligence "occurs" while a plane is flying

---

[19] See *supra,* at 261–262.

over such waters is enough to create such a relationship to traditional maritime activity as to justify the invocation of admiralty jurisdiction.

We need not decide today whether an aviation tort can ever, under any circumstances, bear a sufficient relationship to traditional maritime activity to come within admiralty jurisdiction in the absence of legislation.[20] It could be argued, for instance, that if a plane flying from New York to London crashed in the mid-Atlantic, there would be admiralty jurisdiction over resulting tort claims even absent a specific statute.[21] An aircraft in that situation might be thought to bear a significant relationship to traditional maritime activity because it would be performing a function traditionally performed by waterborne vessels.[22] Moreover,

---

[20] Of course, under the Death on the High Seas Act, a wrongful-death action arising out of an airplane crash on the high seas beyond a marine league from the shore of a State may clearly be brought in a federal admiralty court.

[21] But see 7A J. Moore, Federal Practice, Admiralty ¶.330 [5], p. 3772 (2d ed. 1972):

"What possible rational basis is there, for instance, in holding that the personal representative of a passenger killed in the crash of an airplane traveling from Shannon, Ireland to Logan Field in Boston has a cause of action within the admiralty jurisdiction if the plane goes down three miles from shore; may have a cause of action within the admiralty jurisdiction if the plane goes down within an area circumscribed by the shore and the three-mile limit; and will not have a cause of action within the admiralty jurisdiction if the plane managed to remain airborne until reaching the Massachusetts coast? And this notwithstanding that in all instances the plane may have developed engine trouble or been the victim of pilot error at an identical site far out over the Atlantic."

[22] Apart from transoceanic flights, the Government's brief suggests that another example where admiralty jurisdiction might properly be invoked in an airplane accident case on the ground that the plane was performing a function traditonally performed by waterborne vessels, is shown in *Hornsby* v. *Fish Meal Co.*, 431 F. 2d 865 (CA5 1970), which involved the mid-air collision of two light aircraft

other factors might come into play in the area of international air commerce—choice-of-forum problems, choice-of-law problems,[23] international law problems, problems involving multi-nation conventions and treaties, and so on.

But none of these considerations is of concern in the case before us. The flight of the petitioners' land-based aircraft was to be from Cleveland to Portland, Maine, and thence to White Plains, New York—a flight that would have been almost entirely over land and within the continental United States. After it struck the flock of seagulls over the runway, the plane descended and settled in Lake Erie within the territorial waters of Ohio. We can find no significant relationship between such an event befalling a land-based plane flying from one point in the continental United States to another, and traditional maritime activity involving navigation and commerce on navigable waters.

Just last Term, in *Victory Carriers, Inc.* v. *Law,* 404 U. S., at 212, we observed that in determining whether to expand admiralty jurisdiction, "we should proceed with caution . . . ." Quoting from *Healy* v. *Ratta,* 292 U. S. 263, 270 (1934), we stated:

> " 'The power reserved to the states, under the Constitution, to provide for the determination of controversies in their courts may be restricted only

---

used in spotting schools of fish and the crash of those aircraft into the Gulf of Mexico within one marine league of the Louisiana shore.

    [23] In such a situation, it has been stated:

"Were the maritime law not applicable, it is argued that the recovery would depend upon a confusing consideration of what substantive law to apply, *i. e.,* the law of the forum, the law of the place where each decedent [or injured party] purchased his ticket, the law of the place where the plane took off, or, perhaps, the law of the point of destination." 7A J. Moore, Federal Practice, Admiralty ¶ .330 [5], p. 3774 (2d ed. 1972).

> by the action of Congress in conformity to the judiciary sections of the Constitution. . . . Due regard for the rightful independence of state governments, which should actuate federal courts, requires that they scrupulously confine their own jurisdiction to the precise limits which [a federal] statute has defined.' "

In the situation before us, which is only fortuitously and incidentally connected to navigable waters and which bears no relationship to traditional maritime activity, the Ohio courts could plainly exercise jurisdiction over the suit,[24] and could plainly apply familiar concepts of Ohio tort law without any effect on maritime endeavors.[25]

It may be, as the petitioners argue, that aviation tort cases should be governed by uniform substantive and procedural laws, and that such actions should be heard in the federal courts so as to avoid divergent results and duplicitous litigation in multi-party cases. But for this Court to uphold federal admiralty jurisdic-

---

[24] There is no diversity of citizenship between petitioners and the City of Cleveland.

[25] The United States, respondent Dicken's employer, can be sued, of course, only in federal district court under the Federal Tort Claims Act, 28 U. S. C. §§ 1346 (b) and 2674. Such an action has been filed by the petitioners here, but even in that suit the federal court will apply the substantive tort law of Ohio. Thus, Ohio law will not be ousted in this case, and the pendency of the action under the Tort Claims Act has no relevance in determining whether the instant case should be heard in admiralty, with its federal substantive law.

The possibility that the petitioners would have to litigate the same claim in two forums is the same possibility that would exist if their plane had stopped on the shore of the lake, instead of going into the water, and is the same possibility that exists every time a plane goes down on land, negligence of the federal air traffic controller is alleged, and there is no diversity of citizenship. This problem cannot be solved merely by upholding admiralty jurisdiction in cases where the plane happens to fall on navigable waters.

tion in a few wholly fortuitous aircraft cases would be a most quixotic way of approaching that goal. If federal uniformity is the desired goal with respect to claims arising from aviation accidents, Congress is free under the Commerce Clause to enact legislation applicable to all such accidents, whether occurring on land or water, and adapted to the specific characteristics of air commerce.

For the reasons stated in this opinion we hold that, in the absence of legislation to the contrary, there is no federal admiralty jurisdiction over aviation tort claims arising from flights by land-based aircraft between points within the continental United States.[26]

The judgment is affirmed.

---

[26] Some such flights, *e. g.*, New York City to Miami, Florida, no doubt involve passage over "the high seas beyond a marine league from the shore of any State." To the extent that the terms of the Death on the High Seas Act become applicable to such flights, that Act, of course, is "legislation to the contrary."