ALTON VANN, SR. ET UX. *v.* WILBUR WILLIE ET AL.

[No. 145, September Term, 1977.]

*Decided November 10, 1977.*

50

The cause was argued before GILBERT, C. J., and THOMPSON and MOORE, JJ.

*Samuel D. Hill*, with whom were *Lynn D. Tanner, Jr.*, and *White, Mindel, Clarke & Hill* on the brief, for appellants.

*C. Russell Fields*, with whom were *Charles S. Keyes* and *Keyes & Simmons* on the brief, for appellee Wilbur Willie. *Austin W. Brizendine, Jr.*, with whom were *Austin W. Brizendine* and *Brizendine & Brizendine* on the brief, for other appellee.

GILBERT, C. J., delivered the opinion of the Court.

The Chesapeake Bay and its tributaries are described in a well-known television commercial as "The Land of Pleasant Living." [1] It sometimes happens, however, as the instant case evidences, that living in the Bay area can be not so pleasant.

The skeletal scenario of this appeal is relatively uncomplicated. The record discloses that late on the afternoon of August 16, 1973, Alton Vann, Sr. (Vann), the appellant, launched himself on his daily swim in a placid

---

1. A phrase used in advertisements for The National Brewery.

part of Bush River. Vann's swim was abruptly halted when he was struck by a motorboat. The collision resulted in injury to Vann's head and right arm.

While the plot line is simplicity itself, the details of the narrative lead to considerable complication. Although the offending motorboat was the property of H.E. Koontz Creamery, Inc., (Koontz), it was kept at Bush River for the use and enjoyment of Koontz's trusted executive employees. Immediately prior to the injury of Vann, the boat was used by one such employee, appellee, Wilbur Willie (Willie), for water-skiing. Willie had just released the tow line so as to "drop off" near shore when the boat, piloted by Willie's son-in-law, Richard Varnedoe [2] (Varnedoe), struck Vann.

During the three-year period preceding the collision, Willie and through him, Varnedoe had access to the boat and used it. Neither Willie nor Varnedoe ever received more than cursory instructions on operating the boat. Neither had boating experience prior to 1969 or 1970, and they were not familiar with water safety regulations. Furthermore, neither Willie nor his son-in-law ever availed himself of any courses on boating procedure or safety.[3]

The main stage prop in this drama was an Aristocraft 66 fiberglass boat approximately sixteen (16) feet in length and powered by a sixty (60) horsepower outboard motor. At full throttle, the boat was capable of a land speed equivalent to twenty-five (25) to thirty (30) miles per hour. As with any stereotype villain, the vessel bore an identifying scar. Stretching from the top to the bottom of the windshield, just to the right of the helm, forming a jagged line about one-quarter ($1/4$) of an inch wide was a crack. A storm or accident caused the fracture in the windshield sometime in 1969 or 1970. When the crack occurred and continuing thereafter, George C. Oursler, president of Koontz, and another employee, rejected the idea of replacing the windshield. Instead, they had the crack secured by bolts,

---

2. Prior to trial, Varnedoe reached a settlement with the appellant for a Joint Tort-Feasor Release.

3. Such courses are available from the United States Power Squadron and the Coast Guard Auxiliary at little or no charge.

nuts, and washers. The washers were described in Vann's brief as being the size of quarters, and they were three (3) or four (4) inches apart, in the right front of the pilot.[4] Oursler testified that the method of repair he chose left the windshield stronger and better able to withstand the bumping action that comes from propelling the boat at high speeds over the wave motion of the water.

The scene now shifts to Alton Vann who, as we have previously noted, was, at the time of the incident, taking his daily late afternoon swim. Vann was habituated to following a set course at approximately the same time each day. Oursler had observed Vann's swimming on about a dozen prior occasions, but he never warned Vann to stay away from in front of the Koontz property,[5] nor did he alert guests at the Koontz beach house as to Vann's recurrent jaunts.

On the day of the happening of the impact giving rise to this litigation, Vann chose to swim a slow crawl,[6] a stroke in which he brought one arm and then the other out of the water, with his face submerged on the stroke with his right arm but turned out of the water in order to breathe when he raised his left arm. His kick was a flutter under water. While swimming, Vann noticed a boat on the same side of the river on which he was swimming, but he paid no attention. He did not check again to see what course the vessel was following, although he did occasionally look up to get his bearings. Vann told the jury that he never heard the sound of the boat motor.

The record shows that both Vann and Varnedoe were oblivious to the sight and sound of Mrs. Varnedoe, Mrs. Willie and Mrs. Haas (Mr. Haas was at that time the observer in the boat),[7] frantically waving and yelling in an

4. The crack may be visualized by creating a mental picture of the dial of a clock. The crack, as you face the clock, would run, irregularly from eleven o'clock to ten to nine to eight to seven.

5. What effect such a warning would have is not explained. We note, however, that the use of tidal waters to the mean high water mark is for *all* of the people, not just the abutting land owner.

6. Vann, in response to a question of whether he swam the American or Australian crawl answered that it was "my crawl."

7. The observer's task was to watch the skier so that he would not be lost if for any reason he fell from the skis.

attempt to alert Vann and Varnedoe that they were in danger of hitting each other. Varnedoe said that he noticed his wife running along the pier gesturing and calling out, but he did not think her behavior particularly unusual. The women saw that the boat and the swimmer were on a collision course with the distance between them rapidly closing. The parties could not agree, however, on whether the swimmer was out beyond "the safety point." [8] In any event, their attempts to signal the parties amounted, in the end, to a charade with both boat and swimmer being stumped as to its meaning.

Ignorant of the Maryland Agency Rules and Regulations, Title 08, Department of Natural Resources, Rule 08.04.22 [9] mandating that when water-skiing the towing boat must not be within one hundred (100) feet from shore, piers, bridges, people in the water, or passing other boats, Varnedoe operated the boat as close as twenty-five (25) to forty (40) feet from piers north of the Koontz property. Rule 08.04.22 contains an exception not applicable to the case *sub judice*, and that is that it is permissible for "a person . . . [to] begin skiing on land or shore."

After Willie had released the tow line, Varnedoe cut back on the throttle, put the gear shift in neutral, and turned sharply to starboard, *i.e.,* toward the center of the river. While in the midst of the starboard turn, Varnedoe felt "a bump." He had not seen anyone in the water, nor did he realize that he had struck Vann until the boat stopped and he heard a yell. Varnedoe then saw Vann and jumped overboard so as to assist Vann in making his way to shore.

---

8. The term "the safety point" is undefined in the record. We glean, however, that the term as used in the case meant twenty-five (25) feet beyond the poles off the end of the Koontz pier. Just how this determination was made is not explained.

9. Md. Nat. Res. Code Ann. § 1-202 (1974), authorized the Secretary of the Department of Natural Resources to enforce "all natural resource [resources] laws of the state" and rules and regulations. Md. Nat. Res. Code Ann. § 1-104 (g) (1974) provides that the "Secretary is responsible for promulgating rules and regulations for the department." Md. Nat. Res. Code Ann. § 2-310 (1974) prescribes the penalty to be imposed by a court for violation of the "subtitle or any rule or regulation promulgated pursuant to" the subtitle and classifies such violation as a misdemeanor. It is apparent that the Secretary's properly adopted rules and regulations are law.

54

An ambulance was called and Vann was transported to the hospital.

Subsequently, Vann brought suit against Varnedoe, Willie and Koontz. After a series of pleadings and demurrers, the case finally went to trial before Judge Edward D. Higinbothom and a jury in the Circuit Court for Harford County on Vann's fourth amended declaration. At the close of the evidence presented by Vann, Judge Higinbothom directed a verdict in favor of all defendants.[10]

On appeal to this Court, Vann raises seven (7) issues for our review. He asserts:

"1. The evidence of the condition of the windshield of this boat as it had remained for several years with the irregular crack held together by a number of nuts, bolts, and large washers was sufficient to submit to the jury the question whether it was unsafe for proper vision and lookout through that part of the windshield.

2. Maritime Law does apply to this collision and operation of this boat on the navigable waters of the Bush River, so that the jury could have found that the Appellee Koontz provided an unseaworthy boat and/or crew.

3. Also, if question 1 is answered affirmatively, there was sufficient evidence to submit to the jury the negligence of the Appellees, or at least the Appellee Koontz, for negligent entrustment of an unsafe boat to Varnedoe.

4. There was also sufficient evidence to submit the negligence of the Appellees, or at least the Appellee Koontz, to the jury for negligent entrustment of this boat to those not properly trained to operate it.

5. There was evidence from which the jury could find that the Appellee Willie was liable for the

_____

10. *See* n. 2, *supra.*

negligence of Varnedoe as bailee from Koontz in charge of this boat.

6. The Trial Court erred in excluding the testimony of the Appellee Willie at the District Court hearing on the charge against Varnedoe that 'It is certainly our fault that we could not see him.' and later 'It's no excuse why we did not see him.'

7. The Trial Court erred in sustaining Demurrers to the Fourth Amended Declaration claim for punitive damages against Koontz arising out of negligent entrustment of this boat with the cracked, repaired windshield to those not trained in the safe operation of a boat."

Issues one (1) through six (6) are all interwoven with a common thread, namely, an attempt by Vann to reach Koontz on the theory of negligent entrustment. In order to do so, Vann asserts that the mere allowing of the use of the boat with its cracked windshield was negligent. He then couples to that hypothesis that Varnedoe was an inexperienced boat operator, completely lacking in training. Vann stresses that Varnedoe received no schooling on boat safety or the watermen's "rules of the road."

Our review of the record discloses that despite the valiant effort of Vann's counsel to elicit testimony that the crack in the windshield prevented Varnedoe from seeing Vann in the water, his effort fell short of the mark. Of the four witnesses who testified regarding the cracked windshield, not one of them said that the crack or the bolts and washers materially impaired the vision of the operator. Vann's attorney sought to have the trial court and this Court take judicial notice "that an object right in one's line of vision a couple feet away distorts vision beyond." To bolster his contention, he seeks to have us employ "[a] simple test of holding a pencil or coin at arm's length from the eyes." Such a test, he says "reveals two images of that object, if the viewer is looking beyond the object, or, upon looking at the object, reveals two images of the background." Counsel then asserts that, "The testimony

was that the head of the pilot was 2 or 3 feet from the windshield. Thus, the operator attempting to keep a lookout through the windshield to the water beyond would see 2 images of each large [quarter size] washer and the crack as he looked through that area of the windshield. . . ."

We do not know of any rule of evidence which would permit us to conduct experiments and then take judicial notice of the result. Furthermore, the entire windshield was quite expansive in comparison to the area of the crack, and there would appear to be nothing that impaired vision through the uncracked portion of the windshield. Even with respect to the cracked area, the washers were four (4) or five (5) inches apart, so that there was no unbroken obstruction to vision. More important, however, is the uncontradicted testimony of witnesses produced by Vann that the crack in the windshield did not materially interfere with their ability to see through the windshield. That a similar crack in the windshield of a Koontz truck would require replacement, Md. Ann. Code Art. 66½, §§ 11-1104 (c) and (d) (Repl. Vol. 1970), does not mean that the crack in the windshield of the boat also requires that the boat windshield must be replaced. The legislature has not seen fit to address itself to that subject and the rules and regulations of the Department of Natural Resources do not prescribe replacement of a cracked windshield.[11]

11. By 1904 Md. Laws, ch. 518, the General Assembly provided for licensing of motor vehicle operators, speed limitations, lighting on vehicles, license plates, a ban on automobile racing and penalties for violation of the provisions of Maryland's first motor vehicle code. At that time, there were, according to the United States Department of Commerce, Bureau of Public Roads, Highway Statistics Summary to 1955 (1957), 590 automobiles registered in this State. Trucks were not registered until 1905, and buses were first registered in 1925.

The Department of Natural Resources reports that there were, in 1976, 130,072 boats registered with it. That figure does not include an additional 7,000 boats of five (5) tons or over that have been documented by the Coast Guard. In addition, boats from Delaware, Virginia, Pennsylvania and the District of Columbia regularly ply Maryland waters. There is, as yet, no statute regulating the licensing of boat operators nor is there any requirement that boat owners or operators undergo any type of formalized training before setting forth upon the water. Our policy seems to follow the 1670 English proverb that, "In a calm sea every man is a pilot." In short, if you can buy, rent, borrow or beg a boat, you are free to operate it upon Maryland tidal waters.

Rule 08.04.11 of the Maryland Agency Rules and Regulations, Title 08,

Aside from the "simple test" regarding the pencil, Vann urges that we hold that a photograph, depicting the vessel with its cracked windshield secured by bolts and washers, was sufficient evidence to take the case to the jury. Patently, he invokes the Chinese proverb that, "One picture is worth more than ten thousand words." The difficulty with Vann's position is that the "live" witnesses called by Vann said that the cracked windshield did not materially interfere with their vision, and Vann may not use the photograph so as to impeach his own witnesses and simultaneously create a jury issue. Thus, negligent entrustment,[12] which is grounded on the loaning of a defective chattel was not proven because the "defect" in the chattel was not proven.

We note that while Varnedoe was not schooled in boating safety or operation,[13] he did successfully run the boat for three (3) years, apparently without incident. The fact that he did not receive formal training in boat operation does not,

---

Department of Natural Resources, provides that equipment requirements for motor boats are governed by the federal regulations "set forth in the Boating Act of 1940" as amended in 1958. Significantly, the federal regulations do not require a windshield. They are concerned primarily with fire control and running lights. Motorboat Act of 1940, 46 U.S.C. § 526 *et seq.* (1958).

12. Negligent entrustment, as adopted by the Court of Appeals in Curley v. General Valet Service, Inc., 270 Md. 248, 255, 311 A. 2d 231, 235 (1973), *reversing* General Valet Service, Inc. v. Curley, 16 Md. App. 453, 298 A. 2d 190 (1973) quotes with approval 2 *Restatement (Second) of Torts* § 390 (1965). That section provides:

"One who supplies directly or through a third person a chattel for the use of another whom the supplier knows or has reason to know to be likely because of his youth, inexperience, or otherwise, to use it in a manner involving unreasonable risk of physical harm to himself and others whom the supplier should expect to share in or be endangered by its use, is subject to liability for physical harm resulting to them."

The doctrine is an outgrowth of the principle that:

"[I]n all cases in which any person undertakes [or authorizes] the performance of an act which, if not done with care and skill, will be highly dangerous to the persons or lives of one or more persons, known or unknown, the law, *ipso facto,* imposes as a public duty the obligation to exercise such care and skill."

Van Winkle v. American Steam-Boiler Co., 52 N.J. Law 240, 247, 19 A. 472, 475 (1890), quoted in Rounds v. Phillips, 166 Md. 151, 166, 170 A. 532, 537 (1933).

13. *See* n. 3, *supra.*

under existing law, give rise to a rational inference that his ability to operate the boat was somehow so wanting as to involve "unreasonable risk of physical harm to himself and others." 2 *Restatement (Second) of Torts* § 390 (1965).

We turn now to a discussion of whether the law of admiralty applies to a collision between a sixteen (16) foot pleasure craft and a swimmer. We do so, because, if it does apply, the standard for measuring the unseaworthiness of the Koontz vessel would be quite different than that of ordinary negligence.[14]

Traditionally, admiralty jurisdiction has encompassed "all waters, salt or fresh, with or without tides, natural or artificial, which are in fact navigable in interstate or foreign water commerce, whether or not the particular body of water is wholly within a state, and whether or not the occurrence or transaction that is the subject matter of the suit is confined to one state." Gilmore & Black, *Admiralty* 29 (1957); Note, *Pleasure-Boating and the Admiralty Jurisdiction*, 10 Stan. L. Rev. 724, 725 (1958). *See also* Note, *Admiralty Jurisdiction Over Pleasure Craft Torts*, 36 Md. L. Rev. 212, n. 2 (1976). This definition has been applied to actions involving boats and adequately embraces bodies of water such as Bush River. *Id.*

Historically, the determinative test of admiralty jurisdiction has been a simple locality test. *The Plymouth,* 70 U. S. (3 Wall.) 20, 18 L. Ed. 125 (1866).[15] *The Plymouth*

---

14. The appropriate test of "seaworthiness" is whether the boat was reasonably fit for its intended use. M. Norris, *Your Boat and the Law* 156 (1965).

15. In The Plymouth, 70 U. S. at 35-36, 18 L. Ed. at 128 (1866), the Court said:

"[T]he wrong and injury complained of must have been committed wholly upon the high seas or navigable waters, or, at least, the substance and consummation of the same must have taken place upon these waters to be within the admiralty jurisdiction. . . .

". . . The jurisdiction of the admiralty over maritime torts does not depend upon the wrong having been committed on board the vessel, but upon its having been committed upon the high seas or other navigable waters.

". . . Every species of tort, however occurring, and whether on board a vessel or not, if upon the high seas or navigable waters, is of admiralty cognizance."

The "Plymouth Test" was reiterated in Victory Carriers, Inc. v. Law, 404 U.

was interpreted by many to mean that if the tort was committed on navigable waters it was within the admiralty jurisdiction. *See Victory Carriers, Inc. v. Law*, 404 U. S. 202, 205-06, 92 S. Ct. 418, 421-22, 30 L.Ed.2d 383, 387-88 (1971), and cases cited therein, *rehearing denied*, 404 U. S. 1064, 92 S. Ct. 731, 30 L.Ed.2d 753 (1971). Recently, however, the Supreme Court decided that its language in *Plymouth* does not mean what it seems to say,[16] and that there is nothing magical about navigable waters. The locality test is not the sole determinant of maritime jurisdiction. Retreating from the mystical attraction of the navigable water site, the Court, in *Executive Jet Aviation, Inc. v. City of Cleveland*, 409 U. S. 249, 93 S. Ct. 493, 34 L.Ed.2d 454 (1972), held, unanimously, that in addition to the locality test, there must be shown some connection with "traditional maritime activity." *Id.* at 261, 93 S. Ct. at 501, 34 L.Ed.2d at 463. In *Executive Jet*, the Court had before it a fact pattern involving a plane crash into Lake Erie. The crash was caused by some seagulls becoming ingested into the plane's jet engines with a resulting "almost total loss of power." *Id.* at 250, 93 S. Ct. at 496, 34 L.Ed.2d at 457. The owner of the aircraft, Executive Jet, invoking federal admiralty jurisdiction, sued the City of Cleveland in a United States District Court, which dismissed the action. Mr. Justice Stewart, writing for the Court, noted that the locality test was conceived in 1813 by Mr. Justice Story, on Circuit, in *Thomas v. Lane*, 23 F. Cas. 957, 960 (No. 13, 902) (CC Me. 1813), at a time when it was difficult to imagine "a tortious occurrence on navigable waters . . . [except those involving] a waterborne vessel." *Id.* at 254, 93 S. Ct. at 497, 34 L.Ed.2d at 459. The Court then said that it had "never explicitly held that a maritime locality is the sole test of admiralty jurisdiction. The last time the Court considered the matter, the question was left open. *Atlantic Transport Co. v. Imbrovek*, 234 U.S. 52, [34 S. Ct. 733, 58 L. Ed. 1208]

---

S. 202, 205-06, 92 S. Ct. 418, 421-22, 30 L.Ed.2d 383, 387-88 (1971), citing 40 cases as supporting the test.

**16.** If the language of The Plymouth, n. 14, *supra*, was taken literally, a collision between two swimmers resulting in injury to one or both would be subject to admiralty law.

(1914)." [17] *Id.* at 258, 93 S. Ct. at 499, 34 L.Ed.2d at 461. The Court declared:

> "In sum, there has existed over the years a judicial, legislative, and scholarly recognition that, in determining whether there is admiralty jurisdiction over a particular tort or class of torts, reliance on the relationship of the wrong to traditional maritime activity is often more sensible and more consonant with the purposes of maritime law than is a purely mechanical application of the locality test." 409 U. S. at 261, 93 S. Ct. at 501, 34 L.Ed.2d at 463.

Thus exits *The Plymouth* litmus paper locality test as the sole test for ascertaining when admiralty jurisdiction exists in a particular case.

Since the decision in *Executive Jet*, the test is whether there exists some nexus between the tort and traditional maritime activity. If there is such a bond, admiralty law applies. In the absence of the link, however, admiralty law does not apply, and the case is governed by the law of negligence.

Save for those small pleasure craft used in charter service, motorboat owners and operators have no discernible commercial or maritime interests to protect. *Executive Jet* makes manifest that admiralty jurisdiction necessitates a connection "with traditional maritime activity." The Court, in *Executive Jet*, indicated, without deciding, that such activities as swimming and waterskiing are not within the

---

**17.** *But see* Victory Carriers, Inc. v. Law, 404 U. S. at 205, 92 S. Ct. at 421, 30 L.Ed.2d at 387, citing Atlantic Transport Co. v. Imbrovek, *supra*, as authority for the locality test. In *Atlantic Transport*, Mr. Justice Hughes (later Chief Justice), speaking for the Court, said:

"Even if it be assumed that the requirement as to locality in tort cases, while indispensable, is not necessarily exclusive, still in the present case the wrong which was the subject of the suit was, we think, of a maritime nature and hence the District Court, from any point of view, had jurisdiction. . . .

. . . If more is required than the locality of the wrong in order to give the court jurisdiction, the relation of the wrong to maritime service, to navigation and to commerce on navigable waters, was quite sufficient." 234 U. S. at 61-62, 34 S. Ct. at 735, 58 L. Ed. at 1212-13.

scope of "traditional maritime activity." [18] Drawing on the Supreme Court's rationale that a maritime nexus test is required to cover those situations "where the invocation of admiralty jurisdiction seems almost absurd," *Id.* at 255, 93 S. Ct. at 498, 34 L.Ed.2d at 460, the Fourth Circuit echoed the Supreme Court's disapproval of decisions holding claims by injured swimmers and waterskiers against owners and operators of towing motorboats within the admiralty jurisdiction of the federal courts. *Richards v. Blake Builders Supply Inc.*, 528 F. 2d 745 (4th Cir. 1975); *Crosson v. Vance*, 484 F. 2d 840 (4th Cir. 1973).

Therefore, although we think Vann met the requisites of the erstwhile locality test, neither he nor either of the appellees was engaged in any "traditional maritime activities." [19] While swimming and waterskiing may be pleasurable pursuits performed in or on water, they cannot be said to fall within the ambit of "traditional maritime activity" as that phrase is employed in *Executive Jet.*

In our view, the law of admiralty has no application to the case *sub judice,* and Vann's allegation of unseaworthiness of the Koontz boat must fail. It follows that the directed verdict on Vann's unseaworthiness claim was properly granted.

We agree with Judge Higinbothom that Willie's testimony in the Maryland State District Court at the trial of Varnedoe should not have been permitted to go to the jury. Consequently, we reject Vann's argument that Willie was liable, as bailee from Koontz, for the negligence of Varnedoe, his son-in-law.

The evidence clearly shows that Willie had "dropped off" from the tow line prior to the boat's striking of Vann. Moreover, the skier, as was Willie, is not the operator of the boat, and unless he falls or lets go of the tow line, he is pulled wherever the operator chooses to steer the boat.

---

**18.** For a thought-provoking discourse on admiralty law and pleasure craft, *see* Note, "Admiralty Jurisdiction Over Pleasure Craft Torts," 36 Md. L. Rev. 212-232 (1976).

**19.** We construe the phrase to mean "traditional maritime commerce" and not merely any activity usually performed for pleasure on or in navigable waters.

We have already seen that there was no evidence presented which would demonstrate that Varnedoe had displayed any prior signs of negligent or careless operation of the vessel so that Willie's permitting Varnedoe to pilot the craft was certainly not a negligent act. The main point that Vann makes is that his counsel wanted to inform the jury in opening statement that Willie "had made an admission before the [District] Court at another hearing arising out of the same accident . . . to the effect that he [Willie] and Mr. Varnedoe were at fault for not seeing Mr. Vann . . . , and that he also admitted that there was no excuse why we did not see him, we still should have seen him." Counsel for each defendant objected. Among the reasons assigned for the objections were 1) the transcript was incomplete because of inaudible portions of the recording from which it was transcribed; 2) Vann's testimony was unavailable because of the inaudible portion of the record; 3) Willie was not in the boat at the time of the incident and since the only allegation against Willie was negligent entrustment, the statement would have no bearing upon that issue; 4) Willie's utterance could not be used to bind Varnedoe.

Judge Higinbothom refused to permit Vann's attorney to "make any reference to the District Court hearing or statements of Mr. Willie at that time." We perceive no error. We agree with the trial judge that inasmuch as Willie was sued on the basis of negligent entrustment, his "admission" against Varnedoe's interest was inadmissible. Moreover, it was, under the circumstances of the case, no more than a conclusory opinion. Furthermore, the transcript of the hearing was never offered into evidence.

In the light of what we have discussed, it is unnecessary for us to consider the remaining issues posed by Vann.

*Judgment affirmed.*
*Costs to be paid by appellants.*