170 F.Supp.2d 960 (2001)
Sharon MEAGHER, Plaintiff,
v.
UNITED STATES of America, Defendant.
No. C-00-3946 WHO.
United States District Court, N.D. California.
August 22, 2001.
*961 Stephen H. Cornet, Oakland, CA, for plaintiff.
Philip A. Berns, U.S. Dept. of Justice, San Francisco, CA, Robert S. Mueller, III, U.S. Attorney's Office, Criminal Division, San Francisco, CA, Stuart E. Schiffer, U.S. Attorney's Office, San Francisco, CA, Raymond M. Paetzold, Paetzold White & Brodsky, Oakland, CA, R. Scott Blaze, U.S. Dept. of Justice, Torts Branch, Civil Division, San Francisco, CA, for defendant.

OPINION AND ORDER
ORRICK, District Judge.
In this maritime tort action brought by plaintiff Sharon Meagher ("Meagher") against defendant United States of America ("United States"), the United States now moves to dismiss the action for lack of subject matter jurisdiction, pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure. For the reasons set forth hereinafter, the motion is granted.

I.
This action arises out of Meagher's trip and fall on board HORNET, an aircraft carrier with a record of distinguished service to her country in three wars.[1] HORNET now sits at anchor in Alameda, California, on the waters of San Francisco Bay, where she is a floating museum and event venue. On May 26, 1998, the United States Navy ("Navy") donated HORNET to a nonprofit group called the Aircraft Carrier Hornet Foundation ("Foundation"), under a ship-donation program authorized by 10 U.S.C. § 7306 ("donation statute"). Pursuant to the Contract of Donation ("Contract") between the Navy and the Foundation, title to HORNET passed to the Foundation, and the Foundation was to operate HORNET as a static museum and floating display. (Mot. Ex. B, Hall Decl. Encl. 2, Contract at 2, 7.)
Meagher worked for the Foundation as its Director of Events, and had an office on board HORNET. She arranged social functions for groups that wanted to use HORNET as a venue for dinners and meetings.
*962 The accident out of which this action arose occurred on November 9, 1998. On that date, Meagher, accompanied by the Foundation's Assistant Chief Engineer, Ernesto Zambrano (known as "Zee"), was walking through areas of HORNET not open to the public, searching for suitable venues for small gatherings. (Mot. Ex. C, Paetzold Decl. Encl. 1, Meagher Dep. at 36:7-27.) The two came to a passageway in which the lights did not work, and were forced to use Zee's flashlight for illumination. (Id. at 45:13-47.) While walking through a doorway in this passageway, Meagher tripped on a coaming (informally called a "knee-knocker"), and fell, sustaining various injuries. (Id. at 60:23-61:2.)[2] She alleges that the Navy was negligent in donating the vessel without removing the coaming, "and/or" without warning of the coaming or advising that it could be removed, and further alleges that the Navy was negligent in not providing adequate lighting. (Compl. ¶ 6.)
The United States moves for dismissal on the grounds that it has not waived its sovereign immunity with respect to this action and, accordingly, the Court lacks subject matter jurisdiction over it.

II.

A.
Meagher's cause of action, while it is one for negligence, must be brought under the Suits in Admiralty Act ("SIAA"). 46 U.S.C.app. §§ 741-752. Meagher's complaint alleges that her cause of action arises under one of the following: the SIAA; the Public Vessels Act ("PVA"), 46 U.S.C.app. §§ 781-790; or the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 1346(b), 2671-2680. Her cause of action, however, can only be brought under the SIAA. The PVA applies only to ships owned or chartered and operated by the United States, 46 U.S.C. § 2101(24), and the United States neither held title to HORNET nor chartered her at the time of the accident. The FTCA does not apply to admiralty claims governed by the SIAA, pursuant to 28 U.S.C. § 2680(d),[3] and this is such a claim because this accident occurred on board a vessel moored in navigable waters and involved a feature, part of a watertight door, which is unique to vessels. See Executive Jet Aviation, Inc. v. City of Cleveland, 409 U.S. 249, 93 S.Ct. 493, 34 L.Ed.2d 454 (1972) (tort claim sounds in admiralty if it is based on wrong resulting in injury in navigable waters and having some nexus with traditional maritime activities).
In actions brought under the SIAA, there are two ways in which the United States may assert sovereign immunity. First, it may show that Meagher cannot demonstrate that she could maintain a proceeding in admiralty against a private person under these circumstances, see 46 U.S.C.app. § 742,[4] or, second, it may show that the challenged conduct falls within the discretionary function exception. *963 See Earles v. United States, 935 F.2d 1028 (9th Cir.1991) (applying discretionary function exception to claims under the SIAA); 28 U.S.C. § 2680(a). The discretionary function exception bars claims "based upon the exercise or performance or failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused." Id.

B.
Pursuant to the waiver of sovereign immunity in the SIAA, Meagher can maintain her action against the United States if her action could be maintained against a private party under traditional maritime law. See 46 app. U.S.C. § 742; Alexander v. United States, 63 F.3d 820, 822 (9th Cir.1995). The level of control exercised by a particular party over the operations of the vessel determines whether a claim may be maintained against that party. See id. at 822;[5]Williams v. Central Gulf Lines, 874 F.2d 1058, 1062 (5th Cir.1989) (no SIAA claim could be maintained against the United States where the United States did not have operational control of the vessel on which the injury occurred).
The level of control maintained by the United States may be ascertained by examination of the donation statute, the Navy guidelines for donating ships, and the Contract, which essentially incorporates the requirements of the Navy guidelines for donating ships into the legal relationship between the United States and the Foundation.
The donation statute's only directives are (1) the contract transferring a vessel "shall include a requirement that the transferee will maintain a vessel in a condition satisfactory to the Secretary [of the Navy]," and (2) the transfer shall be made "at no cost to the United States." See 10 U.S.C. § 7306(b), (c).
The Navy guidelines, entitled NAVSEA Instruction 4520.1A ("NAVSEA Instruction"), provide that donated ships may only be used as "static displays," such as museums, and require that a donee agree to take delivery of the ship on an "as-is, where-is" basis, and "to make repairs as required and to maintain the ship, at applicant's expense, in a condition satisfactory to the Department of the Navy," without expense to the Navy. (Hall Decl. Encl. 1 NAVSEA Instruction at 3.) The NAVSEA Instruction also provides for an initial inspection one year after a donated ship has been opened to the public, and annual inspections thereafter. (Id. at 8.) These inspections are intended to ensure that the donated ships are maintained in a manner satisfactory to the Navy.
The Contract is the best evidence of how much control the Navy retained over HORNET. It sets forth the legal relations of the United States and the Foundation to one another, and sets forth their different responsibilities with respect to HORNET. The Contract provides that the Foundation has operating control over HORNET, and reserves to the Navy certain interests and responsibilities, and approval rights.
Pursuant to the Contract, title to HORNET passed to the Foundation, and the Foundation is to "[e]stablish and operate the Vessel on a non-profit basis as a static display, and as a memorial and museum *964 only." (Id. Encl. 2, Contract at 2.) The Contract also provides that the Foundation will, "[a]t its own expense, without reimbursement or contribution by the Government, protect, preserve, and maintain the [HORNET]," comply with all "Federal, State, and local laws," and "[o]btain all certificates, licenses and permits required by law or regulation." (Id.) Thus, the Contract places control over maintenance and operation in the Foundation's hands, and places with the Foundation responsibility for operating the ship in compliance with the law.
On the other hand, the Contract gives the Navy various approval rights and other interests and responsibilities, and it is on these provisions that Meagher bases her argument that the Navy remained the "putative owner in fact". (Opp'n at 11.) First, the Navy may give the Foundation instructions for repairs, maintenance, and preservation, and the Foundation is under obligation to "[t]ake all steps necessary to comply." (Hall Decl. Encl. 2, Contract at 2.) Second, the Navy conducts annual inspections as required by the NAVSEA Instruction. (Id. at 2.) Third, any modification "which would alter the character defining historic features of the Vessel" may not be undertaken without prior written permission from the Navy. (Id. at 6.) Fourth, the Foundation is required to obtain marine hull insurance and designate the Secretary of the Navy as payee. (Id. at 3.) Fifth, the Navy may take back the ship in case of a national emergency. (Id. at 5.)
These controls do not change the fact that the Foundation owns and operates HORNET. First, according to the Contract, the Navy's right of approval over modifications that change the historic character of HORNET stems from HORNET's designation as a historical landmark, not a supposed ownership interest held by the Navy. (Id. at 6.) Second, although the Navy performs inspections, such as the one performed in this case, the Foundation performs work that the inspections reveal to be necessary. Third, although the Secretary of the Navy is the payee of the hull insurance policy, Meagher provides no authority for the proposition that this gives the Navy operational control. The rights the Navy retains under the Contract do not warrant a finding that the Navy maintains operational control over the vessel, or acts as owner.
The United States did not exercise operational control over HORNET at the time of Meagher's accident. Accordingly, Meagher would not be able to maintain a negligence action in admiralty against the United States were it a private person in this situation, because the United States was not in operational control of HORNET, and, therefore, the waiver of sovereign immunity found at 46 U.S.C.App. § 742, in the SIAA, does not apply. See Alexander, 63 F.3d at 823 ("Because the government did not exercise operational control over the [vessel], a negligence action will not lie against the United States under traditional admiralty principles.") This action is barred.
This is sufficient for dismissal, but the government advances the theory that the discretionary function exception applies here, and the Court will consider it.

C.
The discretionary function exception of 28 U.S.C. § 2680(a), which the Ninth Circuit has read into the SIAA, protects government conduct that is both discretionary, meaning it is not in violation of a mandatory statute or rule, and involves "policy judgment." See Berkovitz v. United States, 486 U.S. 531, 539, 108 S.Ct. 1954, 100 L.Ed.2d 531 (1988). If the Navy's conduct here fits within the discretionary *965 function exception, the United States has sovereign immunity and the Court lacks subject matter jurisdiction. For the following reasons, the Court finds that the Navy's conduct was discretionary and involved the kind of policy judgment that the discretionary function exception was designed to protect.
The United States argues that the discretionary function exception protects the manner in which it donated HORNET pursuant to the donation statute, and that the conduct of which Meagher complains all flows from the manner in which it donated HORNET. (Mot. at 16.) Meagher has not pointed to any statute or rule violated by the United States in transferring the vessel as it did. The donation statute requires that the donation of a vessel be without cost to the United States, and that it be maintained by the donee in condition satisfactory to the Secretary of the Navy. See 10 U.S.C. § 7306. The Navy had discretion to decide how to donate vessels, and the NAVSEA Instruction represents the outcome of the Navy's exercise of discretion. It sets forth the procedures for transferring the vessel, and forms the basis for most, if not all, of the provisions of the Contract. It provides for "as-is, where-is" donation, with an initial inspection and annual inspections, and provides that the donee is to take over operation and maintenance. All the actions of which Meagher complains, namely failure to remove the coamings, warn of them, notify the Foundation they could be removed, and provide lights, come within the "as-is" donation and the grant of operational control and maintenance responsibility to the Foundation.
Meagher contends that the Navy's conduct was not discretionary, and instead consisted of failure to warn of known hazards, but she cites to inapplicable cases for the point. Meagher cites to cases involving land owned and operated by the United States, on which accidents occurred because of the United States' failure to warn of known dangers. See, e.g., Seyler v. United States, 832 F.2d 120 (9th Cir.1987) (involving failure to erect speed limit signs on an Indian reservation); Summers v. United States, 905 F.2d 1212 (9th Cir.1990) (failure to warn of fire danger in National Recreation Area). These cases do not apply because here the act argued to be discretionary was not a failure to warn of known dangers on premises operated by the government.
In contrast to the cases cited by Meagher, a similar case supports the application of the discretionary function exception here. In Reed v. United States Department of the Interior, 231 F.3d 501 (9th Cir.2000), the discretionary function exception was applied to protect the Bureau of Land Management ("BLM") from liability arising out of a personal injury that took place while the land was under license to a festival promoter. Id. at 502, 506. The BLM decided that its personnel would cease monitoring a festival site, in the Nevada desert, at 10:00 p.m. Id. at 506. Some time after 10:00 p.m., the plaintiff was injured by a private vehicle driven over his tent in the dark. Id. at 502. The plaintiff alleged that the BLM acted negligently in ceasing to monitor the festival site at 10 p.m. Id. at 506. The court reasoned that the BLM had exercised permissible discretion in licensing the land for the festival, and deciding how to monitor the land during that time. Id. The Court further noted that "[s]ome would disagree with the manner of the agency's exercise of its discretion, but that is irrelevant." Id. Accordingly, the BLM's decision was protected by the discretionary function exception and the action was barred. Id.
As in Reed, the Navy had discretion to decide how to donate the boat, and exercised *966-974 this discretion by donating the boat "as-is, where-is." The conduct of which Meagher complains stems from this decision, just as the conduct of which Reed complained stemmed from the BLM's decision to cease its monitoring at 10:00 p.m. The Navy's conduct is protected by the discretionary function exception, and this action is barred by sovereign immunity.

III.
Accordingly,
IT IS HEREBY ORDERED that the United States' motion to dismiss for lack of subject matter jurisdiction is GRANTED, and this action is dismissed with prejudice.
NOTES
[1] HORNET was formerly known as the USS HORNET, CVS-12, but upon being stricken from the Naval Register in 1989, she became properly called the "ex-HORNET." The Court will refer to her as HORNET.
[2] A coaming is part of a watertight bulkhead; it is the lower border of a doorway, and rises up about nine inches from the deck. (Mot. at 7:7-13.)
[3] 28 U.S.C. § 2680(d) provides that "the provisions of this chapter [the FTCA] ... shall not apply to ... any claim for which a remedy is provided by §§ 741-752, 781-790 of Title 46, relating to claims or suits in admiralty against the United States."
[4] Section 742 provides "[i]n cases where if such vessel were privately owned or operated, ... or if a private person ... were involved, a proceeding in admiralty could be maintained, any appropriate nonjury proceeding in personam may be brought against the United States[.]"
[5] Meagher argues that Alexander does not provide an applicable standard for this case because, in Alexander, the United States had time chartered the vessel on which the injury occurred. The decision in Alexander, however, rests on the degree of control exercised by the United States. See 63 F.3d at 822.