Britney Michelle JENNINGS
and Christine Johnson,
Plaintiffs,

v.

UNITED STATES of America,
Defendant.

C.A. No. 9:04–1192–PMD.

United States District Court,
D. South Carolina,
Charleston Division.

Dec. 20, 2006.

Samuel L. Svalina, Samuel S. Svalina, Svalina Law Firm, Beaufort, SC, for Plaintiffs.

John H. Douglas, U.S. Attorneys Office, Charleston, SC, for Defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

DUFFY, District Judge.

After hearing and reviewing the testimony and evidence presented during the three-day bench trial of this case from September 26, 2006, through September 28, 2006, and considering the deposition transcripts filed with the court and the stipulations of the Parties, this court makes the following Findings of Fact:

### FINDINGS OF FACT

1. Plaintiff Christine Johnson (hereinafter, "Mrs. Johnson") was, at all times material hereto, the natural mother and legal guardian of Plaintiff Britney Jennings (hereinafter, "Britney"). On December 23, 1997, Mrs. Johnson and Britney were both dependents of Sergeant Herschel Johnson, an enlisted United States Marine stationed in Meridian, Mississippi.

2. Plaintiff Britney Jennings ("Britney") was 11 years old at the time she sustained an injury at her home on December 23, 1997, at the Naval Air Station near Meridian, Mississippi. She was crawling around on shag carpeting when she accidentally impaled a toothpick through the skin over the front of her left kneecap.

3. Mrs. Johnson immediately took Britney to the Branch Medical Clinic at Meridian Naval Air Station (hereinafter "BMC"). Defendant United States of America was the official owner and manager of the United States BMC in Meridian, Mississippi, and had complete control over the operation and administration of BMC on December 23, 1997.

4. On December 23, 1997, BMC was a medical clinic limited to providing diagnosis, care, and treatment to active duty military personnel who presented with minor, non-invasive, medical problems that required minor first aid medical care. BMC was not an emergency medical facility or an emergency department and, therefore, was not managed, equipped, or staffed to provide emergency medical care to patients requiring invasive medical or

surgical diagnosis and treatment. BMC was equipped with a conventional x-ray, but was not staffed with a radiology technologist to perform an underpenetrated, soft tissue x-ray procedure of Britney's injured left knee or a radiologist to interpret said x-ray.

5. On December 23, 1997, BMC was not equipped or staffed to perform a CT, ultrasound, MRI, or other diagnostic imaging procedures.

6. Britney received treatment from then-LT Collette Scheurer, MC, USNR. Dr. Scheurer has since divorced, been remarried and been promoted, so she is currently LCDR Collette Ehnow. For clarity, she will be referred to here only by her name at the time she treated Britney in 1997: Dr. Collette Scheurer.

7. Dr. Scheurer began serving as a flight surgeon at the BMC in May of 1997. In that capacity, she was providing primary medical care to Navy and Marine personnel and their dependents. The BMC was a small clinic, staffed by five to six doctors. On December 23, 1997, Dr. Schuerer was the duty doctor.

8. Britney arrived at the BMC Acute Care Clinic at 11:30 am. The BMC was closing at noon on that day in recognition of the Christmas holiday.

9. Mrs. Johnson advised Dr. Scheurer that Britney had been crawling on the floor and had impaled a dirty old toothpick in her knee. Neither Britney nor her mother knew whether Britney had been injured by a complete toothpick or just a fragment.

10. It is common knowledge that an entire standard, wooden toothpick has two sharply pointed ends and is approximately 2.5 inches (or 6.5 centimeters) in length.

11. When Dr. Scheurer examined Britney, she saw about half of a toothpick protruding from the skin over Britney's kneecap. The toothpick was loose in the wound and Dr. Scheurer removed the protruding portion of toothpick by hand without resistance. The piece of protruding toothpick removed by Dr. Scheurer had one pointed end and one frayed and/or broken end and was not an entire, standard length toothpick. Dr. Scheurer noted in her record of medical care, "object removed → only ½ toothpick obtained ? of remaining toothpick in knee."

12. Because Dr. Scheurer was the only treating physician who saw the size, angle, point of penetration, and the condition of the protruding piece of toothpick, she was the only treating physician who had the best opportunity to remove the entire toothpick from Britney's left knee.

13. Prior to pulling out the piece of protruding toothpick from Britney's left knee, with her fingers, Dr. Scheurer did not know the length of the toothpick and did not order any diagnostic imaging studies to be performed; further, Dr. Scheurer did not suggest that Britney be taken to any one of the three hospitals in Meridian, fifteen miles away, that were equipped to perform a CT, ultrasound, MRI, or any other diagnostic imaging procedure.

14. Immediately after removing the protruding fragment of toothpick, Dr. Scheurer suspected but did not know if any toothpick remained in Britney's knee. Dr. Scheurer should have reasonably believed, or known, there was a high likelihood that a piece of toothpick remained in Britney's left knee because when she pulled out the protruding end point of the toothpick, the other end of that toothpick did not have a point and was jagged.

15. Wood, if left within the human body, is a highly inflammatory and infectious foreign body. If wood remains in a wound, antibiotics are ineffective in preventing an infection; complete removal of

the wooden foreign body is necessary to lessen the likelihood of infection.

16. Wooden foreign objects cannot be seen on conventional x-rays because wood has the same density as the surrounding tissue, but the point of entry of a toothpick impaled into a knee can be seen and localized on a conventional x-ray. Wooden foreign objects can be seen in soft tissue using an x-ray technique that is under-penetrated. This technique may show gas around the foreign object and, because the soft tissue is underpenetrated by x-rays, it may show the contrast between wood and tissue.

17. At the time of the initial injury, a CT, ultrasound, or MRI most probably would have shown any retained wooden foreign bodies within Britney's soft tissue. After the wooden foreign body has remained in the soft tissue and has become saturated with bodily fluids, it becomes less likely that it will be visible in any of these types of imaging. As such, the best time to determine if a wooden foreign object was retained in Britney's soft tissue was at the time of initial injury.

18. Because she had removed only half of a standard sized toothpick, Dr. Scheurer was concerned that there might be additional toothpick fragments in the wound and obtained consent to explore the wound. Dr. Scheurer performed a local wound exploration through an approximately one-centimeter incision using local anesthesia. No more toothpick was found. Because Dr. Scheurer did not find any remaining toothpick in Britney's left knee, she assumed, concluded, and/or noted in her medical record, "object removed." Dr. Scheurer then irrigated the wound to clean it out and closed it with sutures. Britney was released to her mother with a prescribed antibiotic, and with instructions to return for a wound check in twenty-four

hours and for removal of her stitches in 5 to 7 days.

19. After Dr. Scheurer advised Mrs. Johnson to return with Britney the next morning for a wound check, Mrs. Johnson told Dr. Scheurer that they were going to Beaufort, South Carolina, the following day for the holidays and asked if they could instead go to the Beaufort Naval Hospital ("BNH") for the wound check. Dr. Scheurer told them that would be acceptable. The corpsman assisting Dr. Scheurer entered a note in the Acute Care Clinic log that Britney was "Released to mother. F/U in AM."

20. It is now undisputed that Dr. Scheurer did not remove all of the toothpick that was in Britney's knee. As a result of the wooden foreign body remaining in her knee, Britney suffered severe infections and inflammation, in that area. Over the next two years, Britney underwent four additional surgeries before all remaining portions of toothpick were finally successfully removed and the resulting infections were addressed. Following Dr. Scheurer's failure to remove the toothpick fragments, Britney's medical history as it relates to her knee is as follows:

21. Britney did not go for the wound check the following day as directed, either in Beaufort or in Meridian. Britney went to the Emergency Medicine Department at BNH five days later on December 28, 1997, with complaints of pain and swelling in her left knee. Britney was evaluated and treated by Dr. William T. Robinson, a civilian contract emergency medicine physician. Dr. Robinson was not a federal employee. Dr. Robinson ordered a two-view x-ray series of Britney's knee to rule out any retained foreign body in Britney's knee, which the radiologist interpreted as remarkable only for fluid around the knee joint. No foreign body was seen. Following consultation with the orthopedic sur-

geon on call, Dr. Thor R. Rhodin, Dr. Robinson removed the sutures. No drainage was noted. A sterile dressing was applied. Britney was treated with Motrin, a knee immobilizer, and crutches. She was advised to continue taking the antibiotic and to follow-up in the Orthopedics Clinic at BNH the following day (December 29, 1997).

22. Britney went to BNH Orthopedics on the afternoon of December 29, 1997, and saw Dr. Meade Luby, a contract orthopedic surgeon. Neither Dr. Luby nor Dr. Rhodin (the orthopedic surgeon who had been consulted the day before) were federal employees.

23. Although Britney was seen by Dr. Luby on December 29, 1997, there is no doctor's note of that visit in her medical records, so it is not known what Dr. Luby's analysis and plan for Britney were. Britney's medical records were at the Branch Medical Clinic back in Meridian, and it is not known whether Dr. Luby failed to create a note of Britney's visit or did so but his note simply did not find its way back to her medical record file in Meridian. The Navy's computer records do, however, show that Dr. Luby ordered laboratory tests for which blood was drawn from Britney on the afternoon of December 29, 1997 and the Navy's computer appointment records show her being seen by Dr. Luby in the BNH Orthopedics Clinic for follow-up that day. Dr. Luby did not order any additional imaging studies.

24. Around January 19, 1998, Mrs. Johnson called the BMC trying to get an appointment for Britney to see Dr. Scheurer again. Britney was referred through TRICARE to see a pediatrician, Dr. William Simmons, who was in private practice in the city of Meridian.

25. Britney saw Dr. Simmons on January 19, 1998, complaining about her knee. Dr. Simmons suspected a retained foreign body, but elected to treat her conservatively by placing her on an antibiotic, Keflex, and asking her to return if the problem did not abate. Dr. Simmons did not order any additional imaging studies.

26. On January 27, 1998, Britney returned to see Dr. Simmons and complained about her knee, which now had a swollen spot on it. Dr. Simmons drained the swelling and then arranged through TRI CARE for an immediate referral to a nearby surgeon, Dr. William A. Billups, Jr.

27. Dr. Billups, a general surgeon in private practice, evaluated Britney that same day (January 27, 1998) at his office in Meridian, Mississippi. At that time, the history given to Dr. Billups was that Britney had been "crawling around on the floor and stuck a toothpick in her left knee." On examination, she had an approximately 1.5 centimeter area of granulation tissue consistent with a retained foreign body. Dr. Billups ordered no x-rays because in his opinion wood does not show up well at all on such studies, so it would be a wasted exercise. Dr. Billups had access to x-ray, ultrasound, CT and MRI equipment close to his office, but chose not to request any of those. Under local anesthetic, the wound was widely incised and an additional 1.2 centimeter piece of toothpick was found deep within the wound. The wound was then sutured closed in standard fashion. Britney was still taking the Keflex that Dr. Simmons had prescribed for her, so no additional antibiotic was ordered.

28. A surgical pathology report following Dr. Billups' surgery noted that a 1.2 cm fragment of wood had been removed, along with tissue showing acute and chronic inflammatory cell response with abscess formation.

29. Britney was seen in follow up by Dr. Billups on February 10, 1998, when he

noted that the wound had healed well. The sutures were removed and she was advised to return on an as-needed basis. She was orally instructed in wound care.

30. Britney's family subsequently moved to Beaufort in March of 1998. On August 11, 1998, LCDR Michele Gasper, MC, USN, pediatrician, saw Britney at the Beaufort Naval Hospital ("BNH") with complaints of lice, of her face breaking out and of knee pain. Dr. Gasper was not a federal employee. Dr. Gaspar examined Britney's knee, but identified no acute surgical pathology. Her knee pain was treated conservatively with an anti-inflammatory medicine, Motrin, and with home exercises, and she was told to return if the knee pain did not improve in a month or two.

31. On September 22, 1998, Britney returned and was seen by LT Deborah Mills, MC, USNR, a pediatrician, for evaluation of her left knee. Dr. Mills was given a history of a previous foreign body removal and recurrent swelling and pain. Dr. Mills referred Britney to BNH Orthopedics. An x-ray taken at BNH on September 22, 1998, was reported by the radiologist as: "Unremarkable left knee series without radiographic evidence of retained foreign body."

32. Britney was evaluated in BNH Orthopedics Clinic on September 28, 1998 by Dr. Leland Stoddard, a civilian contract orthopedic surgeon. Dr. Stoddard was not a federal employee. Dr. Stoddard noted that Britney had a history of a toothpick being impaled into her left knee with subsequent re-exploration and removal of the toothpick, but had been left with pain to the prepatellar area of the left knee since the injury and that there was no definite sensation of a foreign body. On examination, he noted that the scar was well healed with full range of motion of the joint and no effusion or instability, with

normal x-ray studies. His assessment was prepatellar bursitis with a possible foreign body granuloma. Dr. Stoddard ordered an MRI study of her left knee.

33. An MRI scan of Britney's left knee was performed on October 9, 1998, at Beaufort Memorial Hospital, which did not reveal any foreign body, but did show some tissue swelling in the area in front of her knee.

34. Britney was seen in follow up by Dr. Stoddard on November 16, 1998, and at that time he was still concerned about the possibility of a retained wooden foreign body, although her mother told Stoddard she believed that all of the toothpick had been removed. Britney still had a tender and swollen prepatellar bursa. Dr. Stoddard elected to inject the area with a steroid combined with a local anesthetic.

35. Dr. Stoddard saw Britney again in follow-up on December 14, 1998, where it was noted that the injection had really done no good at all, that she continued to have pain, and that she had developed an almost discrete mass in the medial prepatellar bursal area (that is, on the kneecap but off center toward the middle of the body). Dr. Stoddard recommended exploration and removing the mass with an accompanying bursectomy, hoping to retrieve any retained foreign body that might be there.

36. In a preoperative history and physical dated December 14, 1998, Dr. Stoddard documented the left knee examination as showing a mass along the inferior medial aspect of the patella; the joint itself being normal with no effusion, no pain on motion, and full motion; and a one to two centimeter transverse scar in the middle of the kneecap, somewhat away from the area of swelling. His overall impression was that Britney had a possible retained

foreign body with prepatellar bursitis in the left knee.

37. On December 22, 1998, nearly one year after the original accident, Britney underwent surgical exploration of the left prepatellar area by Dr. Stoddard. When he opened Britney's skin, he found a pus-filled cyst in the medial aspect of the prepatellar bursa. In the cyst was a toothpick fragment with a pointed end. The operation took eighteen minutes. Britney was administered antibiotics for the infection in her knee. The toothpick fragment was given to Britney's mother. Dr. Stoddard sutured the wound closed.

38. Britney was subsequently seen several times in follow up by Dr. Stoddard. He noted that the wound was healing without evidence of infection and that the range of motion of the knee was initially diminished as she was using a knee immobilizer. The sutures were removed two weeks after surgery. She was subsequently weaned from the knee immobilizer. By February 8, 1999, Dr. Stoddard noted that there was still some prepatellar tenderness, with a little thickening and hypertrophy of the scar, but that there was a full range of motion. He referred her to Physical Therapy for scar management, massage, mobilization, and gel dressing.

39. On April 19, 1999, Britney followed up with Dr. Stoddard. He noted there was a fair amount of pain present and that a "frank keloid" scar had formed. She was still tender in the prepatellar bursa, but without signs of inflammation. He injected her knee with a steroid and a local anesthetic. Dr. Stoddard referred Britney to Plastic Surgery to address her painful scar.

40. Britney saw a private plastic surgeon, Dr. Richard Greco, in Savannah on May 7, 1999. He advised her that she would probably be a good candidate for scar revision, but that she should wait about six months before doing anything to make sure her orthopedic care was over and to allow the wound to heal further. She was asked to come back in six months, but she never returned.

41. On May 21, 1999, Dr. Stoddard performed a second outpatient surgical procedure on Britney based on his diagnosis of an infection in her bursa. The procedure performed was an incision and drainage, with partial bursectomy of the left prepatellar bursa. No foreign body was found, but there was evidence of an abscess (which did not extend down to or involve the retinaculum or bone). Pus was expressed on the initial incision. The procedure took seventeen minutes. This time, Dr. Stoddard elected to only partially close the wound and to pack it, apparently due to the extent of infection. Antibiotics were ordered and cultures revealed staphylococcus aureus bacteria, which was sensitive to all the antibiotics tested. Britney was treated with daily doses of one gram of Rocephin (an antibiotic) intravenously for a three day period on an outpatient basis.

42. Dr. Stoddard next saw Britney on May 24, 1999. Her antibiotic was changed to Velosef four times a day and the packing that had been placed was removed. Dr. Stoddard decided to proceed with dry dressings on a daily basis.

43. On June 1, 1999, Dr. Stoddard noted that Britney had a small area of the wound which was still granulating rather than healed. At that time, he began her on Betadine wet-to-dry dressings and told her to return in one week for suture removal and to continue with Velosef.

44. On June 7, 1999, Britney's wound was noted by Dr. Stoddard to be healing well except for a small hole near the bottom of the wound that was draining minimally but did not appear infected. The

sutures were removed and the small opening was closed with Steri-strips with instructions given to change the Steri-strips as needed.

45. On June 14, 1999, Dr. Stoddard saw Britney and noted that her wound was not completely healed nor was it showing any propensity to close over and heal. Dr. Stoddard decided to change tactics and referred Britney to Physical Therapy to begin whirlpools and aggressive packing of the wound, which, at that time had healed except for an area the size of a pencil eraser. Dr. Stoddard did not feel there was any evidence of an ongoing or extending infection, but he continued her on antibiotics as a precaution.

46. On June 21, 1999, Britney, on follow-up with Dr. Stoddard, was noted to have a slight increase in the amount of drainage. On removing the packing from the knee, it was noted that the wound had been packed extensively, almost filling the prepatellar bursa. Dr. Stoddard noted that there was no sign of obvious progressive infection, that no pus was present, and that she was experiencing very little pain or tenderness. The wound was recultured, her antibiotic was changed to Ciprofloxacillin. Dr. Stoddard noted that either intravenous antibiotics or further surgical debridement might be necessary.

47. Britney followed up with Dr. Stoddard on June 28, 1999, and he noted that her wound actually looked better, but continued to be packed very deeply by Physical Therapy. There had been no growth of bacteria from the cultures taken at the previous visit. She was continued on Ciprofloxacillin and Dr. Stoddard noted he was going to ask Physical Therapy not to pack the wound so deeply to hopefully allow it to close.

48. On July 2, 1999, Britney underwent a final outpatient procedure on her left knee to clean up the bursa and remove devitalized tissue. She was kept overnight at the hospital for observation. A swab of the wound area showed normal skin flora. The procedure lasted twenty-three minutes. Britney underwent a course of intravenous antibiotics (Rocephin). On July 12, 1999, Dr. Stoddard removed her from the Rocephin and placed her on Augmenton twice a day. Her sutures were removed on July 21, 1999, by Dr. James Amlicke, an associate of Dr. Stoddard, and Britney's use of the knee immobilizer while at home was discontinued. Dr. Amlicke recommended that she have her scar revised in about one year to permit the wound to completely heal.

49. On August 24, 1999, Britney saw Dr. James Amlicke again. At that time, Dr. Amlicke concluded after examination that Britney had normal function at the knee joint, slight residual numbness around the knee attributed to a minor nerve injury during the procedures she had undergone, and a well-healed wound. Britney was discharged from care at that point and was instructed to return in one year for the scar check.

50. On November 2, 1999, LCDR Clifton Woodford, MC, USN, a family practice physician, saw Britney for a sports physical. He found no apparent residual impairments and cleared her for cheerleading.

51. At the conclusion of her treatment, Britney was left with a long scar over her left knee, approximately six to seven centimeters long, which was also fairly wide and had a puckered appearance. The length of the scar was the result of the length of the incision that was necessary to locate and remove the remaining toothpick fragment and the width of the scar was largely the result of the amount of flexing that Britney did with her knee when the wound was healing.

52. In total, Britney had five surgeries performed on her knee between December 23, 1997 and July 2, 1999. During that time, Britney experienced infections, chronic inflammations, swelling, abscesses, chronic and severe pain, restriction of motion of her left knee and leg, loss of range of motion to her left knee and leg, and had to undergo and participate in numerous physical therapy sessions to improve her condition.

53. On December 30, 1999, Britney Jennings and Christine Johnson filed administrative claims under the Federal Tort Claims Act with the United States Navy. They alleged that Britney's extensive injuries resulted from Dr. Scheurer's negligent failure to remove the entire toothpick at the time of the original injury. Accordingly, the issue before the court is whether Dr. Scheurer violated accepted standards of medical care on December 23, 1997 when she attempted to remove the toothpick which was impaled in Britney Jennings' knee, and left behind a portion of the toothpick.

## ACCEPTED MEDICAL STANDARDS

### Plaintiff's Experts

54. In the present case, Plaintiffs presented five expert witnesses who testified, either at the trial or by deposition, as to the relevant accepted standard of care to be followed by a physician when presented with a patient with an impaled wooden foreign body in her knee.

55. All of Plaintiff's experts testified that the standard of care required for a qualified emergency physician confronted with a situation in which a patient's knee is impaled by a toothpick is to take reasonable steps to ensure that the toothpick is entirely removed from the knee and that the wound is thoroughly cleaned.

56. **Dr. Thomas Wood**, Plaintiffs' expert on standard of care, is currently working as a primary care doctor, although he was trained and previously practiced as a surgeon. Dr. Wood testified that Dr. Scheurer deviated from accepted medical standards when she (1) did no radiological imaging before removing the toothpick from the wound, (2) made too small an incision to explore the wound, (3) failed in her absolute duty to find all of the toothpick, (4) failed to refer Britney to a more appropriate doctor to treat the injury, and (5) closed the wound with sutures rather than leaving it open to drain. Dr. Wood further testified that if these steps had been taken, Britney probably would have healed with only some antibiotics and aftercare.

57. **Dr. James Amlicke** is an orthopedic surgeon who had previously been a member of the orthopedic group that contracted to perform the orthopedic services for the Beaufort Naval Hospital, but had since retired for a while and then recently become associated with the Medical University of South Carolina. Dr. Amlicke has had practice experience in orthopedic surgery for the past four decades. Dr. Amlicke is not trained as a radiologist and does not personally perform ultrasounds.

58. Dr. Amlicke testified that the situation in which a patient has a wooden object impaled in the area of a joint is a serious matter not to be taken lightly by a physician. Such injuries have the potential of being extremely dangerous, especially considering the near certainty of infection with a retained wooden foreign object. As such, if a physician believes there is a possibility that wood remains within a wound, the standard of care dictates that the physician either ensure that the entire wooden object is removed, or to refer the patient to a facility that can so ensure.

59. In reference to this particular case, Dr. Amlicke authored an opinion letter for Plaintiffs stating that Dr. Scheurer deviated from acceptable medical standards because she (1) failed to refer the patient to a surgeon, (2) failed to get the patient to an orthopedic surgeon within twelve hours, (3) failed to do radiological imaging of Britney's knee, and (4) failed to send someone from hospital staff to the patient's home to "look for the other piece of toothpick." Dr. Amlicke further testified at trial that (1) Dr. Scheurer was inadequately trained and experienced to perform this procedure, (2) the Branch Medical Clinic was inadequately lit, (3) the one-centimeter incision was inadequate to explore the wound, (4) a doctor presented with a suspected retained wooden foreign body had a mandatory duty to find and be certain that she retrieved any and all wooden foreign bodies in the patient, and (5) the note written by Dr. Scheurer was deceptive as to whether the toothpick had been entirely removed.

60. **Dr. William Daniels,** an orthopedic surgeon who retired from active practice in 1995 or 1996, also testified as an expert for Plaintiffs. Dr. Daniels provided Plaintiffs with an opinion letter in which he identified the deviations from accepted medical standards by Dr. Scheurer as (1) lack of imaging such as soft tissue x-rays or ultrasound, (2) grossly inadequate exploration of the wound for the toothpick, and (3) closure of a contaminated puncture wound. Dr. Daniels also testified at trial that Dr. Scheurer deviated from accepted medical standards by (1) taking an inadequate history, (2) performing an inadequate physical examination, (3) failing to order imaging such as ultrasound or soft tissue x-rays, (4) providing inadequate diagnosis and treatment, (5) performing an inadequate exploration of the wound, (6) failing to reexamine the patient within twenty-four hours, (7) treating the patient when she had inadequate training and experience, (8) treating the patient in an inadequate facility, (9) pulling the toothpick out with her fingers, (10) not leaving the toothpick in position until someone did radiological studies of it, and (11) failing in her mandatory duty to remove all of the toothpick from the patient. However, Dr. Daniels admitted at trial that he was not testifying as to the standards of practice that might be applicable to a family practice doctor because "they may have different criteria than I have. I have surgical criteria."

61. **Dr. Ronald Washburn,** Plaintiffs' radiologist expert, testified that an ordinary x-ray would be a poor choice for detecting wooden foreign bodies in soft tissue, but that an x-ray taken while the toothpick was protruding from the wound would indicate the location of the remaining portion of the toothpick. Further, Dr. Washburn testified that, "CT, ultrasound and MR are very good at picking up both the foreign body reaction and the foreign body itself, i.e. wood, in this case, as opposed to X-ray. Any one of those modalities could have been used." Dr. Washburn testified that, considering the inflammatory nature of wood and the likelihood of infection from a retained portion of wood, Dr. Scheurer breached the relevant standard of care by not ordering any imaging of Britney's knee prior to removing the toothpick.

62. **Dr. Thomas Vescio,** Plaintiffs' infectious disease expert, offered the opinion that it was a "violation of generally accepted standard of practice to let the patient leave the office without specific written instructions that there may be toothpick left or portions of the toothpick left in her knee." Dr. Vescio also testified that in his opinion Britney's staphylococcal infection was a result of the toothpick being impaled in her knee on December 23, 1997. He did

not offer any opinions on standard of care for primary care doctors because he is an infectious disease expert and does not provide primary care.

### Government's Experts

63. The United States presented the deposition testimony of **Doctor Scheurer** (now Ehnow), who testified that everything she did was within the accepted standards of medical care. At the time she treated Britney in December of 1997, she had been dealing hands-on with minor procedures such as this for a period of over four years, which included removing foreign bodies from under the skin. During the period she was in Meridian, she was not only providing primary medical care through the BMC, but was also moonlighting in local emergency rooms. Dr. Scheurer testified that she did not order any imaging because the only imaging directly available to her at the BMC was x-ray and she knew from her training that any wooden foreign object was highly unlikely to show up on x-ray. Dr. Scheurer testified that the only access to CT, ultrasound or MRI would have been about fifteen miles away at the hospital in downtown Meridian. She closed the wound with sutures because she concluded, based on everything she knew and had seen in the case, that the wound was most likely not contaminated and should be closed, and that the decision on whether to close a wound or leave it open is a judgment call for the treating physician. Dr. Scheurer believed that she had removed the entire portion of toothpick from Britney's knee; however, she was still concerned enough about the possibility of a retained piece of toothpick that she explored the wound through a one centimeter incision and then arranged for follow-up in twenty-four hours for a wound check. When the patient's family indicated they could not return the following day, but could be seen in at the Beaufort Naval Hospital, Dr. Scheurer accepted that as a workable method to obtain close follow-up.

64. The United States also presented the testimony of **Dr. Christine Carr,** an assistant professor and Associate Director of Emergency Services at the Medical University of South Carolina. Dr. Carr testified that Dr. Scheurer did not deviate from accepted medical principles and that Dr. Carr would have provided the same treatment that Dr. Scheurer provided to Britney if Britney had been referred to her emergency room. Dr. Carr testified to the type of experience in removing foreign bodies that Dr. Scheurer would have had from her training and experience that would be applicable to this minor procedure. Both Drs. Scheurer and Carr testified that the skills involved in removing foreign bodies from the immediate subcutaneous region do not differ greatly depending upon which area of the body is involved, other than being aware of the underlying tissue and taking appropriate care to stay within the cutaneous and immediate subcutaneous tissue planes.

65. Dr. Carr testified that x-rays are generally useless when dealing with suspected wooden foreign bodies. Dr. Carr further testified that CT and MRI are not routinely ordered in the emergency room setting for an initial presentation that includes a potential retained foreign body, unless it is an extremely dangerous potential foreign body. Her testimony was supported by recognized medical authorities, such as a chapter by G. Rudnitsky in the Robinson and Hedges textbook, *Clinical Procedures in Emergency Medicine,* in which he wrote:

> CT or MRI probably should not be routinely ordered from the emergency department unless one suspects a particularly dangerous foreign body such as an interorbital foreign body or if a previ-

ously negatively explored wound exhibits recurrent infection, poor healing or persistent pain.

66. Dr. Carr testified that in 1997, MRI use was constrained by lack of resources and any request for an MRI for Britney's case would have entailed a day or two wait for the procedure. Dr. Carr further testified that given the close proximity of the toothpick fragments to Britney's kneecap, an ultrasound study in December 1997 most probably would not have revealed the missing fragments.

67. Dr. Scheurer made an incision approximately one-centimeter in length in an attempt to locate all of the toothpick. Dr. Carr testified that the decision on how wide an incision to make is not subject to any precise guidelines and is a matter of medical judgment based on the patient's situation. She indicated that in this situation, a one centimeter incision could be adequate to satisfy the relevant standard of care.

## CONCLUSIONS OF LAW

### LIABILITY UNDER THE FEDERAL TORT CLAIMS ACT

68. This is a medical malpractice action brought against the United States under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 1346. This Act allows an individual to bring a claim against the United States for money damages for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment. 28 U.S.C. § 1346(b)(1).

■ 69. Under the FTCA, the United States waives its sovereign immunity only with respect to tort claims in which "the United States, if a private person, would be liable to the claimant in accordance with

the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b)(1). The FTCA therefore does not create any substantive rights enforceable against the United States in suits for money damages; it merely adopts the substantive tort law "of the place where the act or omission occurred" as the rule of decision, subject to the exclusions and qualifications of the FTCA. Thus, the starting point with respect to the plaintiff's claim is whether the ultimate facts as alleged and proved give rise to a cause of action under the laws of Mississippi for the damages claimed. *Carlson v. Green,* 446 U.S. 14, 100 S.Ct. 1468, 64 L.Ed.2d 15 (1980); *Executive Jet Aviation, Inc. v. City of Cleveland,* 409 U.S. 249, 273, n. 25, 93 S.Ct. 493, 34 L.Ed.2d 454 (1972); *Richards v. United States,* 369 U.S. 1, 82 S.Ct. 585, 7 L.Ed.2d 492 (1962).

■ 70. Two damages limitations under the FTCA are applicable in this case. First, Plaintiffs may recover only compensatory damages as allowed by Mississippi state law; punitive damages may not be recovered. *See* 28 U.S.C. § 2674. Second, no pre-judgment interest may be recovered in an FTCA action. *See In re Air Crash Disaster at Charlotte, N.C. on July 2, 1994,* 982 F.Supp. 1115, 1128 (D.S.C. 1997). Plaintiffs have not sought either in this case.

### MEDICAL MALPRACTICE LAW IN MISSISSIPPI

■ 71. "To prove a medical malpractice claim, a plaintiff must show: (1) the existence of a duty on the part of the physician to conform to a specific standard of conduct; (2) the specific standard of conduct; (3) that the physician's breach of the duty was the proximate cause of the plaintiff's injury, and (4) that damages resulted." *Young v. University of Missis-*

*sippi Medical Center,* 914 So.2d 1272, 1276 (Miss.App.2005). "Given the circumstances of each patient, each physician has a duty to use his or her knowledge and therewith treat ... each patient, with such reasonable diligence, skill, competence, and prudence as are practiced by minimally competent physicians in the same specialty or general field of practice throughout the United States, who have available to them the same general facilities, services, equipment and options." *Hall v. Hilbun,* 466 So.2d 856, 873 (Miss.1985).

72. Mississippi law does consider the quality of the facilities available to a particular physician, and the physician has a duty to make "adept use" of "such medical facilities, services, equipment and options as are reasonably available." *Hall,* 466 So.2d at 872; *Turner v. Temple,* 602 So.2d 817 (Miss.1992).

73. In the seminal *Hall v. Hilbun* decision, the Supreme Court noted that "there remains a core of validity to the premises of the old locality rule.... Because of these differences in facilities, equipment, etc., what a physician may reasonably be expected to do in the treatment of a patient in rural Humphrey County or Greene County may vary from what a physician in Jackson may be able to do. A physician practicing in Noxubee County, for example, may hardly be faulted for failure to perform a CAT scan when the necessary facilities and equipment are not reasonably available." 466 So.2d at 872.

74. There may be more than one acceptable treatment option for a medical problem. If the physician chooses one of the reasonable treatment options within the standard of care, that choice does not create liability. *Day v. Morrison,* 657 So.2d 808, 812, 815 (Miss.1995) (rejecting a "mere error in judgment" jury charge, reasoning, inter alia, that selecting among multiple acceptable courses of action would not be error at all).

75. "[Mississippi] law has never held a physician or surgeon liable for every untoward result which may occur.... A physician is not an insurer of the success of his care and treatment." *Hudson v. Taleff,* 546 So.2d 359, 364 (Miss.1989).

76. Under Mississippi law, the appropriate standard of care in a medical malpractice action is objective and requires the fact-finder to determine if the physician exercised the degree of care, diligence, and skill ordinarily possessed and exercised by a minimally competent and reasonably diligent, skillful, careful, and prudent physician in that field of practice. *Miss.Code Ann.* § 6-5-484 (1975); *Bickham v. Grant,* 861 So.2d 299, 303 (Miss.2003); *Day,* 657 So.2d at 812–15; *McAllister v. Franklin County Memorial Hosp.,* 910 So.2d 1205, 1210 (Miss.App. 2005).

77. What the physician may have been thinking in "his best judgment" is irrelevant. *Bickham,* 861 So.2d at 303.

78. Applying the law to the facts in this case, the court finds that Plaintiff has proven by a preponderance of the evidence that Dr. Scheurer, by virtue of their doctor-patient relationship, had a duty to Britney Jennings to exercise that degree of knowledge, training, skill, and experience that is ordinarily possessed and exercised by qualified emergency physicians in good standing throughout the United States of America, under the same or similar circumstances in the diagnosis, care, and treatment of Britney on December 23, 1997.

79. As all expert witnesses have testified, the standard of care required for a qualified emergency physician confronted with a situation in which a patient's

knee is impaled by a toothpick is to take reasonable steps to ensure that the toothpick is entirely removed from the knee and that the wound is cleaned and either sutured or left open to drain.

■ 80. The fact that Dr. Scheurer believed or assumed that all of the toothpick had been removed does not satisfy the generally accepted standard of medical and surgical practice and care. A reasonably diligent, skillful, careful, and prudent emergency physician would have used diagnostic radiological imaging studies and/or appropriate and effective surgical exploration on December 23, 1997, or shortly thereafter, to establish or confirm the fact that there was no piece or splinter of toothpick remaining in the left knee joint of Plaintiff Britney Jennings.

■ 81. That the standard of medical and surgical practice and care for the removal of a wooden foreign body from a knee requires a treating physician who is unsure if there is any retained wooden foreign object in the knee to make a wide enough incision into the wound site in order to effectively and successfully explore the wound until the treating physician is certain there is no retained foreign wooden body (remaining piece of toothpick) in the wound.

82. As all of Plaintiffs' experts have testified, the one (1) centimeter incision for surgical exploration made by Dr. Scheurer on December 23, 1997, to Britney's left knee was totally inadequate for an effective and successful exploration of the wound for any retained toothpick and was a deviation from the generally accepted standard of medical and surgical practice and care.

83. The bare fact that the toothpick was not found during Dr. Scheurer's exploration does not mean her exploration was inadequate; however, due to the high probability of a retained foreign body, a one-centimeter incision was clearly inadequate to ensure that the foreign body was completely removed.

84. Initially, Dr. Scheurer did not deviate from the standard of care in not immediately referring Britney to an emergency room fifteen miles away for appropriate imaging; however, when the removal of the protruding portion of the toothpick and the one-centimeter exploration of the wound failed to locate the remaining portion of the toothpick, it was a violation of the standard of care to not refer Britney to a facility that was equipped with a CT, ultrasound, or MRI equipment when such imaging would have ensured that no portion of toothpick remained in the wound.

85. Dr. Scheurer did not deviate from the standard of care in suturing Britney's puncture wound.

86. In summary, the court finds that Dr. Scheurer deviated from the applicable standard of care in the following ways:

a. In failing to perform the radiological imaging studies available at the BMC on December 23, 1997, namely conventional x-rays, of Britney's left knee when such radiological imaging studies may have indicated the location of the remaining entire toothpick, prior to pulling out the portion of the toothpick sticking out from Britney's left knee;

b. In failing to refer Britney to one of the three (3) local hospital emergency departments in which radiological imaging studies of Britney's left knee, such as ultrasounds, MRI's, and/or CT scans, would have been available to confirm that the entire toothpick was removed from Britney's left knee after removing the portion of the toothpick; such radiological imaging studies most proba-

bly would have shown and revealed if there was any remaining pieces or splinters of the toothpick;

c.  In failing to make an adequate surgical incision for the proper, effective and successful exploration of the wound for further retained toothpick when Dr. Scheurer was not sure if there was any more toothpick in Britney's left knee;

d.  In failing to refer Britney to any one of three (3) emergency hospital departments in Meridian, Mississippi, and/or to an experienced emergency physician, orthopedic surgeon, or general surgeon for the emergency diagnosis, care, and treatment of Britney on December 23, 1997 when she knew, or in the exercise of reasonable care she should have known, that the BMC healthcare facility was not adequately equipped with soft tissue underpenetrated plane x-ray, ultrasound, MRI scanning, or CT scan.

■  87.  As a result of Dr. Scheurer's failing to exercise that degree of knowledge, training, skill, and experience in the diagnosis, care, and treatment of Britney on December 23, 1997, that is ordinarily possessed and exercised by qualified emergency physicians in good standing throughout the United States of America, under the same or similar circumstances, Britney suffered damages and is entitled to recovery.

### MISSISSIPPI LAW OF DAMAGES

■  88.  Under Mississippi law, a successful plaintiff in a medical malpractice action is entitled to recover for all damages proximately resulting from the physician's negligence. *Miller v. U.S.*, 431 F.Supp. 988 (S.D.Miss.1976); *Clayton v. Thompson*, 475 So.2d 439 (Miss.1985).

■  89.  In the context of medical malpractice, a successful plaintiff is entitled to recover both "noneconomic damages" and "economic damages." Noneconomic damages are defined as "subjective, nonpecuniary damages arising from death, pain, suffering, inconvenience, mental anguish, worry, emotional distress, loss of society and companionship, loss of consortium, bystander injury, physical impairment, disfigurement, injury to reputation, humiliation, embarrassment, loss of enjoyment of life, hedonic damages, other nonpecuniary damages, and any other theory of damages such as fear of loss, illness or injury. The term, however, does not include punitive or exemplary damages." *Miss.Code Ann.* § 11–1–60(a).  Actual economic damages "means objectively verifiable pecuniary damages arising from medical expenses and medical care, rehabilitation services, custodial care, disabilities, loss of earnings and earning capacity, loss of income, burial costs, loss of use of property, costs of repair or replacement of property, costs of obtaining substitute domestic services, loss of employment, loss of business or employment opportunities, and other objectively verifiable monetary losses." *Miss.Code Ann.* § 11–1–60(b).

■  90.  The general rule is that medical expenses are recoverable only where they are proved by a preponderance of evidence to be necessary and reasonable. *Scott County Co-op v. Brown,* 187 So.2d 321 (Miss.1966).  Any hospital, doctor, medical or other related expenses, and any loss of earnings or income sustained cannot be left to conjecture, but must be specifically established.  *Mills v. Balius,* 254 Miss. 353, 180 So.2d 914 (1965).

■  91.  There are some damages, such as medical expenses and loss of income, which must be proved with reasonable certainty, but there are also some damages, such as pain and suffering, that

are not susceptible of proof as to monetary value, and these items must be left to the discretion of the fact finder as long as the amount thereof, under all the evidence, is just and reasonable. *Sharp v. Odom*, 743 So.2d 425 (Miss.App.1999).

92. Historically, most jurisdictions which have addressed the issue of whether the parents of a negligently injured child could recover damages for loss of that child's "consortium" have refused to recognize such a right of recovery. Annotation, "Parent's Right to Recover for Loss of Consortium in Connection with Injury to Child," 54 A.L.R.4th 112 §§ 2–3 (1993). "Mississippi, along with a majority of other states, does not consider loss of the society and companionship of a child as an element in fixing the damages recoverable by a parent for injuries to a [child]." *Butler v. Chrestman*, 264 So.2d 812, 816 – 817 (Miss.1972) (citing 59 Am.Jur.2d, Parent and Child, section 118 (1971)). As such, to the extent a parent claims damages for loss of her child's consortium due to the child's injuries, no recovery is available.

93. Generally, under Mississippi law, recovery for medical expenses associated with a minor child's injuries are properly recoverable by the parents; thus a claim for such expenses properly belongs to the parents. *Cook v. Children's Medical Group, P.A.*, 756 So.2d 734, 740 (Miss. 1999); *Lane v. Webb*, 220 So.2d 281, 286 (Miss.1969); *St. Regis Paper Co. v. Seals*, 211 So.2d 547 (Miss.1968).

94. Under Mississippi law, the parent of a minor child may recover reasonable and necessary medical expenses incurred as a result of the injury the minor child sustained, including travel expenses incurred in securing medical treatment. *Mississippi Law of Damages* § 35:3 (3d ed.). However, incidental expenses unrelated to the provision of treatment are clearly not recoverable.

95. If the parent provided medical services to the injured child herself, such as nursing care, the parent may recover these expenses, too, upon proof of their value. *Wright v. Standard Oil Co.*, 319 F.Supp. 1364 (N.D.Miss.1970), rev'd in part, 470 F.2d 1280 (5th Cir.1972). The measure of such damages is the reasonable value of the nursing services performed, not the amount of income the parent lost by providing nursing services rather than performing her usual work. *See Mississippi Law of Damages* § 35:3 (3d ed.).

96. In an appeal from an award of damages from a bench trial, the appellate court will review the district court's determination of the damage award under the clearly erroneous standard. Fed. R. Civ. P 52(a) ("In all actions tried upon the facts without a jury ... [f]indings of fact shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses."); *United States Fire Ins. Co. v. Allied Towing Corp.*, 966 F.2d 820, 825 (4th Cir.1992); *see Little Beaver Enters. v. Humphreys Rys.*, 719 F.2d 75, 79 (4th Cir.1983) ("The trial court, as a fact finder, possesses considerable discretion in fixing damages, and its decision will be upheld absent clear error."); *see also United States ex rel. Maddux Supply Co. v. St. Paul Fire & Marine Ins. Co.*, 86 F.3d 332 (4th Cir.1996) ("The calculation of damages is a finding of fact and therefore is reviewable only for clear error, but to the extent those calculations were influenced by legal error, review is *de novo*.").

### *Evidence of Britney's Economic Damages*

97. Because all of Britney's past medical expenses have been paid by the United States and/or Tricare, Plaintiffs do not

seek recovery for these expenses. However, Plaintiffs request compensation for all future medical expenses Britney may incur.

99. Dr. Greco, a plastic surgeon, testified that Britney's scar could be significantly improved by additional surgery, and that the pain associated with the attachment of the skin to the underlying tendon could also be alleviated. After such an out-patient procedure, if Britney immobilizes her knee for up to three months, she could then expect to have "a relatively fine lined scar" and less pain in her knee. In its entirety, this surgery and all follow-up visits would cost $2,881.00.

99. Plaintiffs also claim that Britney will suffer future lost income because, due to her physical limitations, she most probably cannot perform the physical duties required of her desired profession as a registered nurse.

100. Dr. Benson Hecker, a vocational expert, testified that if Britney is otherwise qualified to be a registered nurse, and is unable to pursue this profession due to her knee injury, she will suffer a loss of $15,300 annually in decreased salary (assuming she attains a 2 year associates degree rather than pursuing a career in nursing). As such, Dr. Hecker testified that Britney will suffer a loss of $688,500 in lost income over her 45–year work life expectancy.

101. Dr. Hecker's basis for selecting the career of nurse for Britney had she not been injured was simply that Britney told him she wanted to be one. Britney has never applied to nursing school, nor has Britney completed the prerequisites for a nursing program. Dr. Hecker admitted that he had neither formally evaluated Britney nor checked to see if she met even minimum requirements for admission to any nursing school. Dr. Hecker admitted that Britney's SAT scores of 430 on verbal and 430 on math would not permit admission to any of the nursing schools suggested to him by counsel, and that those scores were in the 24th and 22nd percentiles, respectively. At the time of trial, Britney was neither in school nor employed.

102. Plaintiffs further argued that Britney most probably will suffer a decrease in her ability to earn income due to her physical limitations, regardless of whether she could have been a registered nurse. Plaintiff presented no evidence as to how and to what extent Britney's injury limits her ability to earn income, assuming she could not have been a registered nurse.

103. While it would be possible under the evidence to find that Britney's choice of fields of employment may be limited in the future by problems with her knees, the court finds that there is no factual basis for finding that Britney will lose any income in the future, much less for estimating an amount. Plaintiffs made no claim for past lost income.

### Evidence of Britney's Non–Economic Damages

104. Due to Dr. Scheurer's negligence, Britney developed a severe staphylococcus aureus infection and suffered prolonged medical treatment of her left knee, which involved five (5) surgeries and hospitalizations over the course of the next two or more years for treatment of chronic inflammation, chronic infections, severe chronic pain, swelling, chronic abscesses, and physical impairment. As a result of the infection in her left knee, Britney has required prolonged physical therapy and other medical treatment for her left knee and leg up to the present date. Both the medical evidence and the testimony heard at trial establishes that, due to Dr. Scheurer's negligence, Britney has suffered, and will continue to suffer, severe and lingering physical pain in her knee.

105. Prior to her injury, Britney was an active and athletic child. She danced, played soccer, competed in beauty pageants, enjoyed hiking and was a cheerleader.

106. Due to the pain and physical limitations caused by her knee injury, Britney was unable to participate fully in these activities during her high school years. Britney and Mrs. Johnson both testified that her inability to participate in the activities she enjoyed caused Britney to suffer a loss of enjoyment of life, as well as mental and emotional distress.

107. Dr. Royce Malphrus, a psychotherapist, testified that he treated Britney when she was fifteen years old for depression and emotional distress. He testified that Britney was self-conscious about her scar, and was depressed about her inability to participate in her former activities due to her injury. At one point in his treatment of Britney, Dr. Malphrus felt that she had developed suicidal ideation and he referred her to another physician to receive medication for her depression.

108. Dr. Malphrus further testified that Britney was likely to suffer from depression in the future, and would need counseling and perhaps medication for at least a few years into the future. He explained that if she follows a course of treatment, however, her depression and emotional distress were unlikely to effect her ability to complete college or to secure and maintain a job.

109. On cross-examination, Dr. Malphrus admitted that Britney's depression and emotional difficulties arose, in no small part, from her family situation, a bad break-up with her boyfriend, and other stresses in her life unrelated to her knee injury. It also became clear on cross-examination that Dr. Malphrus had been unaware of several significant events in Britney's life, which he admitted would

have affected his opinion regarding Britney's family dynamic and general situation.

110. Dr. Dowse Rustin submitted an opinion letter stating that Britney suffered permanent physical impairment of twenty-one percent (21%) to the lower left extremity or eight percent (8%) to the whole person. He further opined that she had limited use of the left knee. Dr. Rustin testified that he would have to reevaluate his impairment rating if Britney had scar revision surgery and that he could not estimate what that impairment rating might be if that were done.

111. Dr. Rustin concluded in his initial evaluation letter that Britney would not likely need any further surgery other than the scar revision, and he explicitly excluded the probability of any major surgery such as knee replacement.

112. Britney clearly has and will continue to have physical pain and suffering, physical impairment, physical disfigurement and impairment of enjoyment of living as a result of Dr. Scheurer's negligence. Britney's emotional distress and depression were also exacerbated by the limitations and disfigurement caused by her knee injury; however, the extent of her emotional distress and depression were significantly influenced by stressors in her life unrelated to her knee injury.

### Evidence of Mrs. Johnson's Damages

113. Mrs. Johnson testified that she drove Britney to over one hundred and fifty (150) doctor, emergency room, and physical therapist visits from December 23, 1997 to the present. She asserts that she drove over five-thousand (5,000) miles to all of these appointments. She seeks to be reimbursed for her mileage in taking Britney to her necessary medical treatments.

114. In calculating the total number of miles traveled, Mrs. Johnson calculated the distance between her home and the physicians' offices. Then, referring to the print-out of Britney's medical history provided by the Naval Hospital, she calculated the number of times she drove these distances in order to take Britney to her appointments. Mrs. Johnson submitted her calculations regarding her mileage in Plaintiff's Exhibit 11. On cross-examination, Mrs. Johnson admitted that six of the listed appointments were unrelated to Britney's knee; therefore, she agreed that the mileage to these six appointments should not be included in calculating her travel expenses.

115. According to the United States General Services Administration, reimbursement rates for privately owned vehicles were $0.31 on December 23, 1997 and through September 8, 1998. On September 8, 1998, the rate increased to $0.325. On April 1, 1999, the rate decreased to $0.31. On January 14, 2000, the rate increased to $0.325, then increased again on January 22, 2001, to $0.345. On January 21, 2002, the rate increased to $0.365. On January 1, 2003, the rate decreased to $0.360.

116. Mrs. Johnson submitted to the court her calculations as to the mileage for which she claims to be entitled to reimbursement. After examining the listed patient visits submitted by Mrs. Johnson, and considering only those visits which related to treating Britney's knee injury, the court finds that Mrs. Johnson traveled 6,847 miles in order to secure medical treatment for Britney's knee injury. The court further finds that this traveling was necessary and reasonable and was the proximate result of Dr. Scheurer's negligence.

117. Applying the relevant reimbursement rates to the appropriate mileage described in Plaintiff's Exhibit 11, Mrs. Johnson is entitled to $2,244.99 for the miles she drove to provide Britney with reasonable and necessary medical treatment.

118. Mrs. Johnson also claims that she should recover those wages she lost when she took off work to transport Britney to and from her medical appointments. However, as discussed above, a parent is only entitled to recover reasonable and necessary *medical expenses* incurred as a result of the injury sustained by her child.

119. Mrs. Johnson does not allege that she provided valuable nursing services to Britney, nor does she provide any evidence of the value of her services in transporting and caring for Britney. Mississippi law does not provide recovery to a parent for her own lost income where her child is injured by another's negligence; rather, the appropriate measure of a parent's damages is the value of the necessary and reasonable medical services provided by the parent to the child. Accordingly, the court denies Mrs. Johnson's claim for lost wages.

### The Court's Findings Regarding Damages

120. Considering all of the evidence above, as well as the relevant Mississippi law, the court finds that Plaintiffs have proven by a preponderance of the evidence that they are entitled to the following damages:

a. To compensate Britney for her Past Pain and Suffering, Past Physical Injury and Impairment, Past Emotional Distress, Past Mental Anguish and Depression, Past Permanent Disfigurement, and Past Impairment of Enjoyment of Living the time of the injury to the time of the trial, the court finds that Britney is entitled to recover **$90,000.00**.

b. To compensate Britney for her Future Pain and Suffering, Future Physical Injury and Impairment, Future Emotional Distress, Future Mental Anguish and Depression, Future Physical Permanent Disfigurement, and Future Impairment of Enjoyment of Living, the court finds that Britney is entitled to recover $60,000.00.

c. To compensate Britney for future medical expenses that may be necessary due to her impairment and injury, the court awards Britney $2,881.00.

d. To compensate Mrs. Johnson for her expenses in transporting Britney to and from her reasonable and necessary medical appointments, the court awards Mrs. Johnson $2,244.99.

121. In total, to fully compensate Plaintiffs for all past and future economic and non-economic damages proximately resulting from Dr. Scheurer's negligence, the court awards $152,881.00 to Britney and $2,244.99 to Mrs. Johnson.

**AND IT IS SO ORDERED.**